# United States Court of Appeals for the Federal Circuit

04-5099

MEMBERS OF THE PEANUT QUOTA HOLDERS ASSOCIATION, INC.,
AUGUSTUS GARRETT, JEROME PAULK, FAYE PAULK,
and D. U. PULLUM,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

David Wm. Boone, Boone & Stone, of Atlanta, Georgia, argued for plaintiff-appellants.

Jane W. Vanneman, Senior Trial Counsel, Commercial Litigation Branch, United States Department of Justice, of Washington, DC, argued for defendant-appellee. With her on the brief were Peter D. Keisler, Assistant Attorney General and David M. Cohen, Director.

Appealed from: United States Court of Federal Claims

Judge Christine O.C. Miller

# United States Court of Appeals for the Federal Circuit

04-5099

MEMBERS OF THE PEANUT QUOTA HOLDERS ASSOCIATION, INC.,
AUGUSTUS GARRETT, JEROME PAULK, FAYE PAULK,
and D. U. PULLUM,

Plaintiffs-Appellants,

v.

UNITED STATES,

Defendant-Appellee.

_____

DECIDED:   August 25, 2005

_____

Before LOURIE, BRYSON, and GAJARSA, Circuit Judges.

GAJARSA, Circuit Judge.

Augustus Garrett, Jerome Paulk, Faye Paulk, and D.U. Pullum (collectively "the Members") are individual members of the Peanut Quota Holders Association, Inc. The Members individually appeal the final decision of the United States Court of Federal Claims (the "trial court") awarding summary judgment to the United States ("the government") on the ground that the Members possessed no compensable property interest in the peanut quota allocated to them under the Federal Agriculture Improvement and Reform Act of 1996, Pub. L. No. 104-127, § 155, 110 Stat. 888, 922-

30 (the "1996 FAIR Act").  Members of the Peanut Quota Holders Ass'n v. United States, 60 Fed. Cl. 524 (2004) ("Peanut Quota Holders Ass'n").

The Members are all individuals who owned farms to which peanut quotas had been allocated under the former statutory provisions and who had leased their quotas to other farmers since at least 1998.  The peanut quotas allowed the Members to obtain favorable loan rates[1] for their peanut crop.  The loan rates effectively maintained an artificial minimum price for a quota holder's peanut crop.  Under the former statutory provisions, the loan rates could also be sold or leased.[2]

The statute granting the peanut quotas was amended in 2002.  Farm Security and Rural Investment Act of 2002, Pub. L. No. 107-171, §§ 1301-1310, 116 Stat. 134, 166-83 (the "2002 Act").  The 2002 Act made peanut quotas available only to those who actually farm peanuts and thereby share in the risk of production.  Since the Members had leased their quotas, they were not eligible to receive a peanut quota under the new statutory provisions.  The Members claim that the loss of price support for the 2002 crop and their loss of eligibility for future peanut quotas have led to financial losses.  The gravamen of their complaint is that the new statute effectuated a regulatory taking of the loan rate they would have received in 2002 as well as their eligibility to obtain future peanut quotas.

---

[1]     A loan rate is defined as "[t]he price per unit (bushel, bale, pound, or hundredweight, depending on the commodity) at which the government will provide non-recourse loans to farmers (or associations acting on their behalf).  This short term financing at below market interest rates enables farmers to hold their commodities for later sale."  Agricultural Dictionary, available at http://www.nasda.org/joint/farmbill/dictionary.html (last visited July 13, 2005).

[2]     By leasing a peanut quota allotment a peanut quota holder could retain the peanut quota for use in future years while allowing another farmer to produce peanuts at the quota loan rate.

Upon review, we conclude that the trial court erred in determining that the statutorily created peanut quota is not a property interest. Nonetheless, we agree with the trial court that this property right is not compensable under the Fifth Amendment. Consequently, the judgment of the trial court is affirmed.

BACKGROUND

A.    The History of the Peanut Quota

In order to assess whether the Members have a property interest in the peanut quota, it is necessary to understand the statutory evolution of the peanut quota program. In the 1930s the United States' economic depression particularly affected the agricultural community. Congress, in an attempt to mitigate the effects of the depression on agricultural products, enacted the Agricultural Adjustment Act of 1938 ("AAA"), ch. 30 tit. III, § 301 et seq., 52 Stat. 31, 38, which regulated the production and sale of tobacco and wheat within the United States. The statute instituted acreage allotments to prevent oversupply of the targeted agricultural commodities. In 1941, the AAA was amended to include farm acreage allotments for peanuts. The Agricultural Adjustment Act of 1938, as amended, ch. 39, tit. III, §§ 357-359, 55 Stat. 88, 88-91 (the "1941 Act"). The 1941 Act sought to regulate the production of peanuts to avoid severe fluctuations in price caused by rapid changes in market demand and the year-long lag in response to that demand caused by crop growing cycles. 1941 Act, 55 Stat. at 88. Since 1941, Congress has regulated peanut production primarily through quotas set by the Secretary of Agriculture ("Secretary"), but the nature and reach of the quota system has not remained constant.

Under the 1941 Act, the Secretary was required to proclaim annually the total quantity of peanuts that would be made available for marketing the following year; this was known as the "national marketing quota." This quota was to be equal to the average amount of peanuts harvested during the five years prior to the year of the proclamation, adjusted for trends in production and prospective demand. To apportion the national marketing quota among the producing peanut farms, it was converted to a national acreage allotment. This allotment was derived by dividing the national marketing quota by the normal yield per acre.[3]

The national acreage allotment was divided proportionally among states based on the average relative peanut production per state for the five years immediately preceding the proclamation year, adjusted for trends in yields and abnormal conditions of production. Each state acreage allotment was subsequently apportioned among farms in that state. The farms that obtained allotments were farms on which peanuts were grown in any of the three years immediately preceding the year for which the allotment was determined. The state allotments were apportioned on the basis of the tillable acreage available for the production of peanuts and the past acreage of peanuts grown on the farm. The actual amount of peanuts produced on the acreage allotment equaled the marketing quota for the farm. 1941 Act, 55 Stat. at 89-90.

---

[3] The normal yield per acre was set at the five-year average of the national average yield per acre derived from the years preceding the proclamation year.

A farmer with an allotment was subject to financial penalties[4] if he marketed peanuts in excess of his farm's marketing quota. Any farmer who grew peanuts without an allotment was also subject to financial penalties.[5]

Under the 1941 Act, the Secretary of Agriculture was directed to make loans available to farmers with marketing quotas for peanuts. The Secretary of Agriculture provided the loans through the Commodity Credit Corporation ("CCC"). The CCC offered loans to farmers at rates between fifty and seventy-five percent of the parity price[6] of peanuts. 1941 Act, 55 Stat. at 91. These loans provided farmers with operating capital. The loans were non-recourse, such that if the farmer was unable to sell his crop at a profit and repay the loan with interest before it matured, the CCC accepted the actual peanut crop sales revenue as full repayment of the loan.

The Agricultural Act of 1949, ch. 792, tit. I, § 101, 63 Stat. 1051-52 (the "1949 Act"), instituted the price support program. The 1949 Act increased loan rates overall. It also tied the loan rates into an inverse relationship with the amount of overproduction of peanuts for the year.

The AAA was amended again in 1967 to allow peanut farm owners and operators "to sell or lease all or any part of the right to all or any part of their peanut

---

[4] The penalty was three cents per pound, unless the peanuts were falsely identified or unreported, in which case a fine of twenty-five dollars per acre, or fraction thereof, was imposed.

[5] The penalties for growing peanuts without any allotment were the same as those for exceeding an allotment.

[6] The parity price is defined as "[a] measurement of the purchasing power of a unit of a particular commodity." Agricultural Dictionary, available at http://www.nasda.org/joint/farmbill/dictionary.html (last visited July 13, 2005).

The 1941 Act set the parity price "on the basis of the formula used in determining the parity price of peanuts as published by the Bureau of Agricultural Economics in The Agricultural Situation, volume 25, number 1, January 1941." 1941 Act, 55 Stat. at 91.

acreage allotment." Pub. L. No. 90-211, § 358a, 81 Stat. 658 (the "1967 Act"). The 1967 Act also permitted an owner of a farm with an acreage allotment to transfer the allotment to his other farms. Transfers were restricted such that they were only permitted between farms within the county in which the peanut acreage allotment was apportioned. Other restrictions further limited the transferability of the allotments.

By 1977, the introduction of new seed varieties, new fertilizers, and new farm management techniques had substantially increased the yield of peanuts per acre. As a result, there was an oversupply of peanuts. These conditions prompted Congress to revamp the peanut program in the Food and Agriculture Act of 1977, Pub. L. No. 95-113, §§ 801-807, 91 Stat. 913, 944-49 (the "1977 Act"). The 1977 Act temporarily suspended much of the AAA and its subsequent amendments and, in its place, instituted poundage quotas based on the weight of peanuts produced by the quota holders. The new poundage quotas applied only to peanuts destined for domestic edible use.[7] The poundage quota system was used in conjunction with the acreage allotment system; a poundage quota was established for each farm that possessed an acreage allotment under the AAA.

The 1977 Act also amended the price support program to provide different support levels for "quota peanuts" and "additional peanuts." Quota peanuts were any peanuts that were eligible for domestic edible use and that did not exceed the poundage quota of the farm. Additional peanuts were any peanuts that were in excess of a farm's poundage quota but not in excess of the actual production of the acreage allotment. This differentiation continued to discourage overproduction because the price support

---

[7]  "Domestic edible use" referred to all food uses for peanuts and, at this juncture, included peanuts used for seed. 1977 Act, 91 Stat. at 946.

provided for additional peanuts was substantially lower than that provided for quota peanuts.[8]

In 1981, Congress passed yet another law that temporarily suspended the AAA. The Agriculture and Food Act of 1981, Pub. L. No. 97-98, §§ 701-707, 95 Stat. 1213, 1248-56 (the "1981 Act"). The 1981 Act terminated acreage allocations and marked the end of a four year transition to the poundage quota system that began with the 1977 Act. The 1981 Act retained the two-tiered system (of quota peanuts and additional peanuts) based on poundage. It also enlarged the definition of additional peanuts to include any peanuts that were not covered by a poundage quota, irrespective of whether the peanuts were grown by a farm that possessed a poundage quota. Thus, under the 1981 Act, the peanut quota no longer restricted the production of peanuts. Poundage quota holders simply received more generous support from the government than non-quota holders.

In 1996, to mitigate the ever increasing costs to the public of maintaining the price support programs, Congress enacted the 1996 FAIR Act. The 1996 FAIR Act, like the 1977, 1981, 1985, and 1990 Acts before it, suspended most provisions of the AAA. The 1996 FAIR Act, in large part, continued the system created in 1977 with minor modifications. The price support for peanut producers under the 1996 FAIR Act took the form of marketing assistance loans. The U.S. Department of Agriculture ("USDA") set loan rates and extended these loans to marketing associations, which, in turn, made loans to peanut producers. The loans were again represented by non-recourse notes,

---

[8] The level of support for additional peanuts was calculated by taking into consideration the demand for peanut oil and peanut meal, expected prices of other vegetable oils and protein meal, and demand for peanuts in foreign markets.

such that if the revenue from the sale of the peanuts did not cover the full amount of the loan, the marketing association and, by default, the USDA made up the difference. If the revenue from the sale of the peanut crop covered the loan amount, the producer repaid the loan in full.

The 1996 FAIR Act established marketing loan rates through the 2002 marketing year.[9] The 1996 FAIR Act set the loan rate for quota peanuts at $610.00 per ton. 1996 FAIR Act, § 155(a)(2). By comparison, the loan rate set by the Secretary for non-quota peanuts in 1997 was $132.00 per ton.[10] The loan rate differential, combined with restrictions on importation, gave quota holders a considerable financial advantage in the peanut market by setting a floor on the price they would receive for their crop.

The 1996 FAIR Act specifically allowed quota holders to sell or lease their quotas to other producers with a farm in the same state. 1996 FAIR Act, § 155(i)(6)(A). The 1996 Act also amended the AAA to specifically protect transferors from a subsequent reduction of their quotas: "Any farm poundage quota transferred under this paragraph shall not result in any reduction in the farm poundage quota for the transferring farm if the transferred quota is produced or considered produced on the receiving farm." 1996 FAIR Act, § 155(i)(6)(D).

In 2002, Congress amended the peanut quota program by repealing the marketing quota program, establishing a "buyout" of quota holders, and creating a new price support program. The buyout provision authorized a one-time payment to quota

---

[9] The marketing year is the twelve-month period, generally from the beginning of a new harvest, over which a crop is marketed. For peanuts it is August 1 to July 31.

[10] By statute, the Secretary is required to set the loan rate at a level estimated to ensure that there are no losses by the CCC on the sale or disposal of the peanuts. 1996 FAIR Act, § 155(b)(2).

holders of $0.55 per pound, which equated to a payment of $0.11 per pound for five years.  2002 Act, § 1309(b)(1).

To have been eligible for the new quota, one must have been a "producer on a farm in the United States that produced or was prevented from planting peanuts during any or all of the 1998 through 2001 crop years."  2002 Act, § 1301(5).  Thus, the new quota was available to "an owner, operator, landlord, tenant, or sharecropper that shares in the risk of producing a crop on a farm and is entitled to share in the crop available for marketing from the farm." 2002 Act, § 1301(8).  This definition of producer marks a distinct departure from the definition used in previous statutes, including the 1996 Act, because it excludes from consideration farmers who leased or transferred their quotas to other producers. 7 C.F.R. § 729.214(m) (2003).  Prior to the 2002 Act, farmers were considered producers even if they had leased their quotas and, as a consequence, could have a quota even if they did not share in the risk of producing a crop.

B.    The Proceedings Before the Court of Federal Claims

The trial court determined that the primary issue before it was whether the 1996 FAIR Act created a property interest vested in a peanut quota holder that was eliminated by the 2002 Act.  The Members asserted a regulatory taking of their alleged property right in the peanut quota created by the 1996 FAIR Act.[11]  They argued (1) that the 2002 Act rendered valueless expenditures made in reliance on their peanut quotas

_____

[11]    On appeal, the Members attempt to assert a categorical taking of their "peanut quota" under the Fifth Amendment.  Because the Members failed to raise this issue before the trial court, this court cannot entertain it on appeal.  Absent extraordinary circumstances, an appellant may not raise a new issue on appeal. Singleton v. Wulff, 428 U.S. 106, 120 (1976).

for the 2002 growing season; (2) that by establishing a program of marketing loans open to peanut producers who actually grew peanuts, the statutory changes deprived them of their entitlement to price supports under the 1996 FAIR Act; and (3) that the "buyout payments" established under the 2002 Act did not approximate the fair market value of the repealed "peanut quota."

The trial court determined that while the Members hold protected property interests in farm land and equipment, those property interests do not extend to the crop marketing quotas established by the 1996 FAIR Act. The trial court reasoned that "[a] citizen does not possess the 'right to exclude' when he voluntarily enters an area subject to government control." Peanut Quota Holders Ass'n, 60 Fed. Cl. at 528. The trial court found support for this conclusion from our holding in Mitchell Arms, Inc. v. United States, 7 F.3d 212, 216 (Fed. Cir. 1993). Relying on Mitchell Arms, the trial court reasoned that the expectation of a poundage quota share was merely a collateral interest incident to the Members' ownership of farm land. Peanut Quota Holders Ass'n, 60 Fed. Cl. at 529. The trial court concluded that "[b]ecause Congress has the right to modify or terminate a federal program, the benefits of such a program do not constitute a property interest protected by the Fifth Amendment." Id. Accordingly, the trial court awarded summary judgment in favor of the government. The Members appeal the trial court's decision.

We have jurisdiction pursuant to 28 U.S.C. § 1295(a)(3).

<u>DISCUSSION</u>

A.       <u>Standard of Review</u>

Summary judgment is appropriate if there is no genuine issue of material fact and the moving party is entitled to a judgment as a matter of law. Fed. Cl. R. 56(c); <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986). We review a grant of summary judgment <u>de</u> <u>novo</u> to determine whether the trial court correctly applied this standard. <u>See</u> <u>Cienega Gardens v. United States</u>, 265 F.3d 1237, 1244 (Fed. Cir. 2001).

Whether a compensable taking has occurred is a question of law based on factual underpinnings. <u>Wyatt v. United States</u>, 271 F.3d 1090, 1096 (Fed. Cir. 2001). To evaluate whether a governmental action effects a taking of private property without just compensation, this court must first determine whether the claimant has established a property interest for purposes of the Fifth Amendment. <u>Conti v. United States</u>, 291 F.3d 1334, 1339 (Fed. Cir. 2002). Once a property right has been established, the court must then determine whether a part or a whole of that interest has been appropriated by the government for the benefit of the public. <u>Id.</u> While a taking often occurs as a result of a physical invasion or confiscation, the Supreme Court has long recognized that "if a regulation goes too far it will be recognized as a taking." <u>Pennsylvania Coal Co. v. Mahon</u>, 260 U.S. 393, 415 (1922). The issue in this case is whether, in amending the statute that created the peanut quota, the government effected a compensable taking of a property interest under the Fifth Amendment.

B.      Definition of a Property Right

The Fifth Amendment provides that private property shall not be taken for public use without just compensation. U.S. Const. amend. V, cl. 4. The purpose of the Fifth Amendment, as delineated in the cases interpreting it, is to prohibit the "Government from forcing some people alone to bear public burdens which, in all fairness and justice, should be borne by the public as a whole." Armstrong v. United States, 364 U.S. 40, 49 (1960).

"The Constitution neither creates nor defines the scope of property interests compensable under the Fifth Amendment." Conti, 291 F.3d at 1340 (citing Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972)). The parameters of a protected property interest are delimited by the law that creates the interest, see Roth, 408 U.S. at 577-78, and by "existing rules and understandings" and "background principles" derived from independent sources, such as state, federal, or common law, Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1030 (1992); Maritrans Inc. v. United States, 342 F.3d 1344, 1352 (Fed. Cir. 2003). These "background principles" and "rules and understandings" focus on the nature of the citizen's relationship to the alleged property, such as whether the citizen had the rights to exclude, use, transfer, or dispose of the property. See United States v. Gen. Motors, 323 U.S. 373, 378 (1945). To have a property interest in a benefit, "a person . . . must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." Roth, 408 U.S. at 577.

On the basis of these principles, the Supreme Court and this circuit have evaluated various regulatory schemes to determine whether intangible property such as

04-5099                                    12

government issued permits and licenses give rise to property interests protected by the Fifth Amendment. Specifically, the Supreme Court has found that express statutory language can prevent the formation of a protectable property interest. See United States v. Fuller, 409 U.S. 488, 494 (1973). In the absence of express statutory language, this court has looked to whether or not the alleged property had the hallmark rights of transferability and excludability, which indicia are part of an individual's bundle of property rights. Loretto v. Teleprompter Manhattan CATV Corp., 458 U.S. 419, 435-36 (1982) (describing the right to dispose of property as part of an individual's bundle of property rights); see, e.g., Am. Pelagic Fishing Co. v. United States, 379 F.3d 1363, 1374 (Fed. Cir. 2004); Conti, 291 F.3d at 1341-42; Mitchell Arms, 7 F.3d at 216.

In Fuller, the Supreme Court refused to recognize a property interest in grazing permits issued under the Taylor Grazing Act, 43 U.S.C. § 315. In determining whether a property right existed, the Supreme Court focused on the revocability of the grazing permits and the clear Congressional expression in § 315b that the issuance of a permit under the Act "shall not create any right, title, interest, or estate in or to the lands." 43 U.S.C. § 315. The Court noted that § 315b makes "clear the congressional intent that no compensable property be created in the permit lands themselves as a result of the permit." Fuller, 409 U.S. at 494.

In Mitchell Arms, this court declined to recognize a property interest in a contract entered in accordance with the terms of a firearm import permit issued pursuant to 18 U.S.C. §§ 921-930 and suspended before the contract could be performed. Mitchell Arms, 7 F.3d at 216. Mitchell Arms held that when a citizen voluntarily enters a market subject to pervasive government control he cannot be said to possess the right to

exclude.  Id.  Specifically, this court concluded that the relevant right to exclude that the plaintiff lacked was the ability to exclude others from the market for the sale of firearms. Id.

In Conti, this court failed to find a compensable property interest in the petitioner's fishing permit, relying on: (1) the petitioner's inability to assign, sell, or otherwise transfer the permit; (2) the petitioner's lack of authority to exclude others from the Atlantic Swordfish Fishery; and (3) the government's retained right to revoke, suspend, or modify the permit under 50 C.F.R. § 635.4(a)(3).  Conti, 291 F.3d at 1341-42.  "The absence of crucial indicia of a property right, coupled with the government's irrefutable retention of the right to suspend, revoke, or modify Mr. Conti's swordfishing permit, compels the conclusion that the permit bestowed a revocable license, instead of a property right."  Id. at 1342.

In American Pelagic, we held that there was no protectable property interest in fishery permits and authorizations on the grounds that the petitioner did not have the authority to assign, sell, or transfer its permit and authorization letter and that those legal instruments did not grant the petitioner exclusive privileges to fish for Atlantic mackerel and herring.  379 F.3d at 1374.  This court reasoned that since nothing in the language of the regulations precluded the sanction or denial of a permit for reasons unrelated to enforcement, the government had preserved these rights with respect to the permits and authorization letters issued under the regulation.  Id.

In sum, the decisions by both the Supreme Court and this court imply that a compensable interest is indicated by the absence of express statutory language precluding the formation of a property right in combination with the presence of the right

04-5099                                14

to transfer and the right to exclude.  See, e.g., <u>Fuller</u>, 409 U.S. at 494; <u>Am. Pelagic</u>, 379 F.3d at 1374; <u>Conti</u>, 291 F.3d at 1341-42; <u>Mitchell Arms</u>, 7 F.3d at 216.

C.    <u>Peanut Quota as Property</u>

The dimensions of any property interest the Members may have in peanut quota allotments are defined by the 1996 FAIR Act, which created the peanut quotas at issue. The 1996 Act created a right to plant and produce a certain amount of peanuts for a guaranteed minimum price.  The government argues that this is no more a property right than government issued licenses or permits.   The Members contend that this right is a property right because, unlike the permits and licenses discussed in <u>Conti</u> and <u>American Pelagic</u>, the provisions of the 1996 FAIR Act and state case law establish that a peanut quota allotment was transferable and exclusive.  We agree with the Members.

1.    <u>Transferability</u>

The right to transfer is a traditional hallmark of property.  See <u>Loretto</u>, 458 U.S. at 435-36 (describing the right to dispose of property as part of an individual's bundle of property rights).    The Members have established that the peanut quota was transferable.

The 1996 FAIR Act specifically allowed the peanut quota to be transferred, 7 U.S.C. § 1358a(a) (2000), albeit subject to certain limiting conditions.  The 1996 FAIR Act provides, in relevant part:

> Transfers under this section shall be subject to the following conditions: (1) no allotment shall be transferred to a farm in another county; (2) no transfer of an allotment from a farm subject to a mortgage or other lien shall be permitted unless the transfer is agreed to by the lien-holders; (3) no sale of a farm allotment from a farm shall be permitted if any sale of allotment to the same farm has been made within the three immediately preceding crop years; (4) no transfer of allotment shall be effective until a record thereof is filed with the county committee of the county in which

such transfer is made and such committee determines that the transfer complies with the provisions of this section; and (5) if the normal yield established by the county committee for the farm to which the allotment is transferred does not exceed the normal yield established by the county committee for the farm from which the allotment is transferred by more than 10 per centum, the lease or sale and transfer shall be approved acre for acre . . . .

7 U.S.C. § 1358a(b) (2000).

Transferal of an allotment was historically subject to approval by the local branch of the Agricultural Stabilization and Conservation Service ("ASCS"). See In re Williams, 136 B.R. 311, 313 (Bankr. M.D. Ga. 1992). ASCS approval was constrained by federal law, which only allowed transfers to farms within the same or an adjacent county. See Shepard v. Fed. Land Bank of Columbia, 421 S.E.2d 763, 764 (Ga. Ct. App. 1992).

These restrictions on a quota holder's ability to transfer his or her quota do not distinguish quotas from other transferable goods that are inarguably property, e.g. alcohol and firearms. The mere fact that transfers of allotments are not unrestricted does not undermine the importance of transferability to the characterization of quotas as a form of property.

Further, the Members point out that peanut quotas were long regarded under state law to be personal assets, in part because of their transferable nature. In support of their claims, the Members cite a series of state court decisions that have held a peanut quota to be a personal asset. See, e.g., Mills v. Davis, 577 So. 2d 436 (Ala. 1991) (noting that peanut quotas are personal property subject to payment of debts, but ultimately dismissing appeal as untimely); McKim v. Kauffman, 424 S.E.2d 11 (Ga. Ct. App. 1992) (holding peanut quotas to be property such that a failure to convey a quota under a contract constitutes breach). The government argues that these cases do not

stand for the proposition that quotas are compensable property interests, but only illustrate that, in some circumstances, quotas are treated like property.  The Members counter that the treatment of quotas as property implies that they are property for all intents and purposes.

The cases addressing the issue of whether an agricultural allotment is property are less than straightforward in their conclusions; courts have arrived at different conclusions, compare Walker v. Miller, 507 S.W.2d 606, 609 (Tex. App. 1974) ("An allotment under the [AAA] has been recognized as intangible personal property, subject to devise, inheritance, transfers and sales, division by a district court in divorce proceedings, and to treatment as property in bankruptcy proceedings.  It is recognized that an allotment has a market value, and the statutory restrictions on transfer to not negate the possibility of transfer.") with  Callaway v. Block, 763 F.2d 1283, 1290 (11th Cir. 1985) ("Appellants have no protected property interest in quotas per se nor in the specific quotas they had in 1983 or any other price year."), and even the holdings of individual courts are muddled, seeming to come down on both sides of the issue, see, e.g., In re Jackson, 169 B.R. 742, 749 n.2 (N.D. Fla. 1994) ("[C]ourts have stated that an allotment is a type of intangible personal property . . . . However, allotments cannot be considered as ordinary intangible property in isolation from the statutes and regulations which control their transfer.").

Nonetheless, to the extent that the government's argument relies on the notion that quotas are not transferable, we must disagree.  Despite their apparent ambivalence about whether or not quotas are property, courts across the peanut growing states have held consistently that quotas are transferable, subject to statutory restrictions.  See,

e.g., Smith v. Smith, 656 So. 2d 814 (Ala. App. 1994) (holding transferable in divorce); McKim, 424 S.E.2d at 12-13 (recognizing transferable through sale); In re Williams, 136 B.R. 311 (M.D. Fla. 1992) (holding transferable in bankruptcy). In this case, the transferability of the quotas supports the conclusion that the quotas constitute property.

### 2.    Excludability

The Supreme Court has recently recognized that the right to exclude is "perhaps the most fundamental of all property interests." Lingle v. Chevron U.S.A., Inc., 125 S.Ct. 2074, 2082 (2005). The Members contend that they have an exclusive interest in their respective peanut quota allotments. They argue that cases such as American Pelagic, Conti, and Mitchell Arms are distinguishable on the ground that the licenses awarded to the various citizens in those cases were not exclusive, whereas the peanut quota allotments awarded here were exclusive. Conversely, the government argues that, at most, peanut quota holders under the 1996 FAIR Act have the power to exclude others from taking advantage of their allotment and that this limited power of exclusion is no different from a fisherman's ability to exclude others from using his fishing license. The government contends that it is still the sole arbiter of who has access to the peanut quota allotments in much the same way as it determines who shall be permitted to obtain a fishing license. The government's position fails to appreciate the difference between a license and a quota.

The salient difference between the licenses in the noted cases and the peanut quota allotment is that the value of the peanut quota is considerably more concrete. A license represents a limited suspension of the otherwise general restrictions imposed by the government—in the case of a fishing license, it is merely a representation by the

government that it will not interfere with the licensee's efforts to catch fish. The number of licenses to be issued under such a scheme is not fixed. Each additional license dilutes the value of the previously issued licenses. So long as the government retains the discretion to determine the total number of licenses issued, the number of market entrants is indeterminate. Such a license is by its very nature not exclusive. Neither the fisherman nor the firearms salesman can exclude later licensees from entering the market, increasing competition, and thereby diminishing the value of his license.

Conversely, the awarding of each additional peanut quota under the 1996 FAIR Act did not increase competition. Peanut quotas represented a right to plant and produce a certain amount of peanuts at a certain price in specific crop years. The statutory scheme limited the number of total pounds of quota peanuts and, in conjunction with the price supports, guaranteed a minimum price on the peanuts. Once a particular quota had been awarded, the granting of further quotas did not dilute that allotment. Under the quota program, the government served as a surety on large agricultural loans for any quota holder who grew peanuts. That benefit, which was a form of monetary subsidy, accompanied every peanut quota that was issued and was not subject to dilution by the issuance of additional peanut quotas. By awarding a quota holder a set price on a fixed quantity of peanuts, the government established a defined market for each quota holder—a market exclusive to that quota holder. Thus, the fact that the government was entitled to confer quota benefits without any prescribed limitation does not mean that the quotas were not a form of property.

A property right accrues when the government has seen fit to take a limited resource and secure it for the benefit of an individual or a predetermined group of

individuals.  The peanut quota holders possessed an excludable interest, because the peanut quota program isolated their particular interest from competition.  For the reasons stated, we conclude that the Members established a property interest cognizable under the Fifth Amendment.

D.    Peanut Quota Not Compensable

The question, therefore, is not whether the peanut quotas have aspects of property, but whether Congress must pay the owners of peanut quotas compensation when it takes steps that render the quotas less valuable, or even valueless.  The answer is no, because the property interest represented by the peanut quota is entirely the product of a government program unilaterally extending benefits to the quota holders, and nothing in the terms of the statute indicated that the benefits could not be altered or extinguished at the government's election.

By analogy, undoubtedly food stamps in the hands of food stamp recipients are property.  Theft or fraud that deprived the owner of food stamps would surely be punishable as theft or fraud directed at property.  But, the government's decision to terminate the food stamp program before the food stamps could be issued would not give rise to an obligation to compensate prospective holders of the stamps.

The same principle applies here.  Peanut quotas are property, but they are a form of property that is subject to alteration or elimination by changes in the government program that gave them value.  The peanut quota granted under the 1996 FAIR Act was a privilege extended by Congress to support farmers during times of market stress as a general policy to attenuate and smooth out the fluctuations of the market place.  Thus, the holders of peanut quotas, like the holders of food stamps, have no legally protected

right against the government's making changes in the underlying program and no right to compensation for the loss in value resulting from the changes. Bowen v. Gillard, 483 U.S. 587, 604 (1987) ("Congress is not, by virtue of having instituted a social welfare program, bound to continue it . . . .").

The explanation of why government termination of such a program does not give rise to a right of compensation has been stated in different ways at different times. It is sometimes said that the property holder's rights in the property have not "vested," see Bowen v. Pub. Agencies Opposed to Soc. Sec. Entrapment, 477 U.S. 41, 55 (1986); it is sometimes said that the property holder has no investment-backed expectation of maintaining a continued right to the property, see Penn Cent. Transp. Co. v. City of N.Y., 438 U.S. 104, 124 (1978); and it is sometimes said that the property is in the form of a gratuity that the government has explicitly or implicitly retained the right to alter or revoke, see Gilliard, 483 U.S. at 604. Each of these characterizations captures the essence of the reason the government's action does not give rise to a constitutional duty of compensation: The government is free to create programs that convey benefits in the form of property, but, unless the statute itself or surrounding circumstances indicate that such conveyances are intended to be irrevocable, the government does not forfeit its right to withdraw those benefits or qualify them as it chooses. Since Congress at all times retains the ability to amend statutes, a power which inheres in its authority to legislate, Congress at all times retains the right to revoke legislatively created entitlements. Pub. Agencies Opposed to Soc. Sec. Entrapment, 477 U.S. at 52 (noting that courts should be "extremely reluctant" to construe statues in a manner that forecloses the ability of Congress to exercise its legislative powers). In this case, there

is nothing to suggest that the peanut quota program was intended to provide irrevocable benefits to quota holders.

The Members contend that the sunset clause of the 1996 FAIR Act somehow transmuted the regulatory scheme promulgated by the act into an irrevocable grant of property. The Members argue that 1996 FAIR Act, § 155(h), which stated "[s]ubsections (a) through (g) shall be effective only for the 1996 through 2002 crops of peanuts," acted to make the provisions of the 1996 FAIR Act irrevocable. Thus, they maintain that the 2002 Act effectuated a taking by impermissibly applying retroactively to the 2002 crop of peanuts for which price supports had already been established under the 1996 Act.

The inclusion of a sunset provision does not operate to transform a regulatory scheme for the distribution of subsidies into a compensable property interest under the Fifth Amendment. We decline the Members' invitation to hold that statutory limitations to the applicability of statutes constitute an abandonment of Congress's inherent authority to legislate. Rather, the sunset provision highlights Congress's intention that the price support provisions be temporary in nature.

To be sure, quota holders who transferred their quotas in the expectation that the benefits of the quota program would continue, in effect unchanged, lost the value of their quotas when the program was altered. But, the fact that quota holders expected to continue to derive benefits from the program does not create rights to compensation from the government. Therefore, as we view this case, the change in the quota program deprived the quota holder's property of value, but the government's conduct did not constitute a compensable taking of that property.

## CONCLUSION

While we conclude that the Members do possess a property interest in the peanut quotas awarded to them under the 1996 FAIR Act, we also conclude that this right is not compensable. Consequently, the 2002 Act did not effect a taking of a Fifth Amendment property right. Because no taking occurred, we do not reach the Members' argument that they were inadequately compensated for their claim. Accordingly, the judgment of the trial court is

## AFFIRMED.

## COSTS

Each party shall bear its own costs.