# United States Court of Appeals

## FOR THE EIGHTH CIRCUIT

———————

No. 08-1239

———————

| | | |
|---|---|---|
| Minneapolis Taxi Owners Coalition, Inc., | * | |
| | * | |
| | * | |
| Plaintiff–Appellant, | * | |
| | * | Appeal from the United States |
| v. | * | District Court for the |
| | * | District of Minnesota. |
| City of Minneapolis, | * | |
| | * | |
| Defendant–Appellee, | * | |
| | * | |
| A New Star Limousine and Taxi Service, | * | |
| | * | |
| | * | |
| Intervenor–Appellee. | * | |

———————

Submitted: November 13, 2008
Filed: July 14, 2009

———————

Before MELLOY, BOWMAN, and SMITH, Circuit Judges.

———————

MELLOY, Circuit Judge.

In 2006, the City of Minneapolis (the "City") amended its taxicab ordinance to uncap the number of transferable taxicab licenses it issues, thereby opening a previously restricted market. The Minneapolis Taxi Owners Coalition (the "Coalition"), a group comprising holders of approximately seventy-five transferable

taxicab licenses, sued the City, asserting federal and state constitutional violations, including violations of the Coalition's members' rights to just compensation and due process. Before trial, A New Star Limousine and Taxi Service ("New Star") intervened and filed a motion to dismiss for failure to state a claim. The district court[1] granted the motion and dismissed the case. The Coalition appeals. We affirm.

I.

The members of the Coalition hold transferable taxicab licenses issued by the City. Although originally purchased from the City for a relatively small fee (roughly $500), the transferable licenses sold on the secondary market for as much as $19,000 to $25,000. The City required administrative approval of all such license transfers, but it routinely granted the required approval.

Before the enactment of the ordinance amendments at issue, section 341.270(a) of the Minneapolis Code of Ordinances required that the city council conduct a hearing at least once every twenty-four months "to consider whether public convenience and necessity warrant additional licenses." Minneapolis, Minn., Code of Ordinances tit. 13, art. II, ch. 341, § 341.270 (1995) (repealed 2006). In determining whether additional licenses were warranted, section 341.270(a) required the city council to consider:

> the level and quality of service being provided by existing taxicab operators; whether additional competition would improve the level and quality of service or the degree of innovation in delivery of services; the impact upon the safety of vehicular and pedestrian traffic; the impact on traffic congestion and pollution; the available taxicab stand capacity; the

---

[1]The Honorable James M. Rosenbaum, United States District Judge for the District of Minnesota, adopting the Report and Recommendation of the Honorable Franklin L. Noel, United States Magistrate Judge for the District of Minnesota.

public need and demand for service; the impact on existing taxicab operators; and such other factors as the city council may deem relevant.

Id. A designated city council committee held open "public convenience and necessity" hearings on May 17, 2006, and June 7, 2006, to gather relevant information. Evidence presented at the hearings included general testimony both in favor of and against issuance of additional licenses; testimony that Coalition members would suffer an economic loss by such an increase; evidence that there was inadequate business for current taxicab operators; evidence of complaints regarding the level and quality of current service; economist testimony that removing the cap on licenses would increase jobs and the level of service provided; testimony that there was an untapped market for bilingual drivers, particularly for the Hispanic community; evidence that the number of wheelchair-accessible vehicles may have been insufficient; and evidence that a number of taxicabs were operating without licenses.

After the hearing, the City's Department of Licenses and Consumer Services Division submitted a "follow-up document" to the committee, stating that there was insufficient availability of taxicabs, especially wheelchair-accessible taxicabs and, during peak hours, taxicabs generally. The submission discussed two possible plans. "Plan A" did not increase the number of licenses, with the advantage that current license holders would retain substantial value in their licenses. "Plan B" increased the number of licenses by forty-five every year until 2010, when the cap would be completely lifted. This plan required that new "licensed service companies" dedicate at least 10% of their fleets to wheelchair-accessible vehicles and at least 10% to "alternative-fuel and/or fuel-efficient vehicles." Plan B also required that existing licensed service companies dedicate at least 5% of their fleets to wheelchair-accessible vehicles and at least 5% to alternative-fuel and/or fuel-efficient vehicles by 2007, with the minimums increased to 10% by 2008. Plan B's perceived advantages included spurring better-quality service through the use of increased

numbers of wheelchair-accessible vehicles and fuel-efficient vehicles. Its acknowledged disadvantages included the likely diminishing of the "monetary value" of existing taxicab licenses "to zero."

The committee recommended to the City that it increase the number of taxicab licenses pursuant to Plan B:

> The Committee, upon weighing the received evidence and while recognizing that the issuance of additional licenses could likely produce a negative initial impact on existing operators, finds that such prospective impact is outweighed by the potential to (1) improve the level and quality of taxicab service to citizens and visitors in Minneapolis through a more open and free market structure as has been accomplished in other jurisdictions, thereby positioning Minneapolis as a more viable destination for entertainment, business, convention and other beneficial economic pursuits, and (2) pursue innovations in delivery of taxicab service in the areas of environmental sustainability while addressing underserved communities including the disabled, bilingual and non-English speaking populations.

In October 2006, the City revised the city ordinance code to lift the cap on licenses per Plan B. See Minneapolis, Minn., Code of Ordinances tit. 13, art. II, ch. 341 (2006).

In March 2007, the Coalition sued the City in Minnesota state court, arguing that the new ordinance reduced the value of the existing licenses to zero. Relying on the U.S. and Minnesota Constitutions, the Coalition claimed that (1) the City deprived Coalition members of their property interests without just compensation; (2) the City deprived Coalition members of their business licenses without due process; (3) the wheelchair-accessibility and fuel-efficiency requirements constituted an unconstitutional exaction; and (4) Coalition members were denied equal protection because the ordinance was amended, in part, to better serve the Hispanic community.

The City removed the case to the district court because the complaint asserted federal constitutional claims. See 28 U.S.C. § 1441(c). In May 2007, New Star moved to intervene, and the district court granted the motion. In June 2007, New Star moved to dismiss the Coalition's complaint under Federal Rule of Civil Procedure Rule 12(b)(6) for failure to state a claim.

In October 2007, a magistrate judge recommended granting the motion to dismiss, concluding that (1) Coalition members did not have a protectable property interest in the secondary-market value of their licenses and that therefore the Coalition had no takings claim; (2) the Coalition's due process claim similarly failed because the City did not deprive Coalition members of any property; (3) the Coalition did not have standing to bring an unconstitutional-exaction claim based on the taxicab fleet requirements because the requirements applied to licensed service companies, not taxicab license holders; and (4) the equal protection claim failed because the ordinance survived "rational basis" scrutiny. In December 2007, the district court adopted the magistrate judge's recommendation and granted New Star's motion to dismiss. The Coalition appeals and repeats its takings, due process, and unconstitutional-exaction arguments before this court.[2]

II.

We review de novo the grant of a motion to dismiss for failure to state a claim under Rule 12(b)(6), accepting the facts as alleged in the complaint and granting all

---

[2]The Coalition does not pursue its equal protection claim on appeal, and that claim is therefore waived. Fair v. Norris, 480 F.3d 865, 869 (8th Cir. 2007). The inclusion of a footnote hinting at a request for additional discovery to support unalleged facts based on "at least a suspicion" of improper motives is inadequate to preserve the claim. See Fed. R. App. P. 28(a)(9)(A) (requiring an appellant's brief to "contain . . . appellant's contentions and the reasons for them, with citations to the authorities and parts of the record on which the appellant relies").

reasonable inferences in favor of the Coalition as the non-moving party. Neighborhood Enters., Inc. v. City of St. Louis, 540 F.3d 882, 884–85 (8th Cir. 2008).

A. Takings

The Coalition argues that removing the cap on the number of taxicab licenses is a taking of private property requiring just compensation under the Fifth Amendment to the U.S. Constitution. See U.S. Const. amend V.[3] The Coalition does not contend that the City revoked or somehow vitiated existing licenses or that opening the market destroyed the ability of the license holders to use their licenses to do business. The Coalition only contends—and the City does not contest—that removing the cap on the number of licenses destroyed the market value of the licenses. The elimination of the market value of the taxicab licenses, however, can be considered a taking under the Fifth Amendment only if there is a protected property interest in that market value. See Lucas v. S.C. Coastal Council, 505 U.S. 1003, 1030 (1992). Property interests "are created and their dimensions are defined by existing rules or understandings." Bd. of Regents of State Colls. v. Roth, 408 U.S. 564, 577 (1972).

Those "existing rules" include relevant state law, id., and the Coalition relies on several Minnesota cases to argue that the holder of a license does have a property interest in that license. See State v. Saugen, 169 N.W.2d 37, 41 (Minn. 1969) (holding that "[a liquor-]license was assignable and transferable and as such can be construed as a property right rather than a privilege"); CUP Foods, Inc. v. City of Minneapolis, 633 N.W.2d 557, 562–63 (Minn. Ct. App. 2001) (finding a property

---

[3]We note that, although the Coalition argued both state and federal takings claims before the district court, it argues only its federal claim on appeal.

interest in a realtor's business license); <u>Bird v. Dep't of Pub. Safety</u>, 375 N.W.2d 36, 42–43 (Minn. Ct. App 1985) (finding a property interest in an automobile dealer's license); <u>see also</u> <u>Boonstra v. City of Chicago</u>, 574 N.E.2d 689, 694 (Ill. App. Ct. 1991) (holding that "a taxicab license and its assignability is a constitutionally protected property interest").[4] <u>CUP Foods</u> and <u>Bird</u> are inapposite to the Coalition's claims, however, because both cases address the complete revocation of the licenses at issue. <u>See</u> <u>CUP Foods</u>, 633 N.W.2d at 562; <u>Bird</u>, 375 N.W.2d at 39. <u>Saugen</u> is similarly inapplicable.

In <u>Saugen</u>, the Supreme Court of Minnesota considered the property right in a liquor license to include the going-concern value of the business where the state had taken the property on which the licensee's business had been located and the licensee was unable to transfer his license to a new location. <u>Saugen</u>, 169 N.W.2d at 39. The court noted that the state's actions had "effectively destroyed [the licence holder's]

---

[4]In <u>Boonstra</u>, the Illinois Appellate Court determined that by "summarily precluding those persons already having an assignable interest in taxicab licenses from being able to assign their property interests, the City of Chicago's action constituted a taking of property without due process and without just compensation." 574 N.E.2d at 695. In effect, "the City of Chicago created for its citizens a public market place for the assignment of its taxicab licenses. Thus, the taxicab licenses in reality became more than just mere personal permits . . . ." <u>Id.</u> at 694. In <u>Boonstra</u>, the City of Chicago totally prohibited all assignment of the licenses, and given the death of the license holder, was akin to a revocation. <u>Id.</u> at 691–92. In the present case, however, licensees are still able to use their licenses and assign their licenses to others. The economic effect is harder to distinguish: under either regulation, licensees are no longer able to transfer their licenses for the significant sums of money they once were. To the extent <u>Boonstra</u> would establish a compensable property right in a regulation-created market value, then, we must decline the invitation to follow the decision of the Illinois Appellate Court. <u>See</u> <u>Movers Warehouse, Inc. v. City of Little Canada</u>, 71 F.3d 716, 719–20 (8th Cir. 1995) ("[T]he property right must arise as a matter of state law; most of the cases cited by [the plaintiff] do not deal with Minnesota law and are thus inapplicable.").

valid and unrevoked ability to engage in the liquor business" and that there was "no problem [in that case] with a speculated [going-concern] loss because the going-concern value ha[d] been stipulated." Id. at 46. In the present case, however, the Coalition does not argue that its licensee–members are no longer able to continue their businesses as operating enterprises. Here, the licensed taxicab businesses "will continue to operate as a going concern, even if profits are somewhat reduced." City of Minneapolis v. Schutt, 256 N.W.2d 260, 263 (Minn. 1977). Saugen cannot be interpreted to establish a property interest different from the interest at issue in that case. Even were we to construe the Coalition's argument as claiming that the market value of a license was representative of the going-concern value of the licensed business, the market value of the license—especially given the existence of the artificially restricted market—was, at best, an incomplete and imperfect assessment of that going-concern value. A property interest cannot be extended to the going-concern value of a licensed business where that going-concern value is merely speculative. Saugen, 169 N.W.2d at 46; see Schutt, 256 N.W.2d at 262–63 (limiting Saugen to its facts). The Coalition is unable to point to any Minnesota law establishing the property interest the Coalition argues has been taken.

The Coalition also relies on the Federal Circuit's decision in Members of the Peanut Quota Holders Ass'n for the proposition that a license to participate in a controlled market is a property interest in the restricted nature of that market, such that the City cannot, without just compensation, reduce the market value of the taxicab licenses by increasing their number. See Members of the Peanut Quota Holders Ass'n v. United States, 421 F.3d 1323, 1334 (Fed. Cir. 2005) ("A property right accrues when the government has seen fit to take a limited resource and secure it for the benefit of an individual or a predetermined group of individuals."). The Peanut Quota Holders decision distinguished between peanut quota allotments, which include a property right, and certain fishing licenses, which do not. Id. at 1333–34. The quotas "guaranteed a minimum price," and "[o]nce a particular quota had been awarded, the granting of further quotas did not dilute that allotment." Id. at 1334.

-8-

The taxicab licensees, with no equivalent guaranteed minimum, cannot be said to share this concreteness of value. Even before the ordinance amendment, the taxicab licenses were similar to the fishing licenses in Peanut Quota Holders in that "[e]ach additional license dilute[d] the value of the previously issued licenses" because the limited resource was subject to increased competition with each additional license. Id. at 1333–34; see Jackson Sawmill Co., Inc. v. United States, 580 F.2d 302, 306–07 (8th Cir. 1978) ("[T]here is no property right or vested interest in a continuing flow of traffic."). The taxicab licenses themselves do not carry an inherent property interest guaranteeing the economic benefits of using the taxicab license.

More broadly, the "existing rules or understandings" that define the dimensions of the property interest indicate that the taxicab licenses were not understood to provide an unalterable monopoly over the Minneapolis taxicab market. See Rogers Truck Line, Inc. v. United States, 14 Cl. Ct. 108, 111 (1987) (holding that a commercial-carrier license "did not give plaintiffs a constitutionally protected freedom from competition"). Property ownership is not without inherent limitation. In the case of real property, compensation is not required where the limitation already "inhere[s] in the title itself, in the restrictions that background principles of the State's law of property and nuisance already place upon land ownership." Lucas, 505 U.S. at 1029. "And in the case of personal property, by reason of the State's traditionally high degree of control over commercial dealings, [a property owner] ought to be aware of the possibility that new regulation might even render his property economically worthless . . . ." Id. at 1027–28. This inherent limitation is especially present in highly regulated markets. Mitchell Arms, Inc. v. United States, 7 F.3d 212, 216 (Fed. Cir. 1993) (stating that an enforceable property interest "cannot arise in an area voluntarily entered into and one which, from the start, is subject to pervasive Government control," because the government's retention of discretion over that area means that the individual "cannot be said to possess the right to exclude" (internal quotations, citation, and emphasis omitted)). The general expectation of regulatory change is no less present where the value of the property interest is derived from the

regulation itself.  See  Peanut Quota Holders, 421 F.3d at 1334 (stating that "[quota holders] have no legally protected right against the government's making changes in the underlying program and no right to compensation for the loss in value resulting from those changes" and that "[q]uotas are property, but they are a form of property that is subject to alteration or elimination by changes in the government program that gave them value").

The "public convenience and necessity" hearings required by the ordinance do not change the understanding that the license to participate in the highly regulated taxicab market is subject to regulatory change.  Contrary to the Coalition's contention, the City retained the discretion to alter the number of licenses, and "[s]o long as the government retains the discretion to determine the total number of licenses issued, the number of market entrants is indeterminate."  Id.  The ordinance expressly contemplated increases in the number of taxicab licenses.  It did not limit the City's discretion to issue additional licenses.  In determining whether to issue additional licenses, the ordinance allowed the City to consider any factors it deemed relevant, and it did not establish any minimum standards that would dictate the City's decision either for or against the issuance of additional licenses.

The Coalition does not allege a taking of the taxicab licenses or of the ability to engage in the licensed activity; rather, the Coalition's takings claim is limited to "the ability to realize an expectation in the ultimate market disposition of the [licenses]."  Mitchell Arms, 7 F.3d at 217.  "This 'collateral interest' incident to . . . ownership . . . is not property protected by the Fifth Amendment."  Id.  Even if there is a property interest in a particular license, "a takings claim cannot be supported by asserting ownership in a property interest that is different and more expansive than the one actually possessed."  Rogers, 14 Cl. Ct. at 114.  We therefore hold that any property interest that the taxicab-license holders' may possess does not extend to the market value of the taxicab licenses derived through the closed nature of the City's taxicab market.  Without such a property interest, their takings claim necessarily fails.

-10-

B.  Due Process

The Coalition also argues that the City's new ordinance violates its members' due process rights under the Fourteenth Amendment to the U.S. Constitution and Article I of the Minnesota Constitution.  See U.S. Const. amend. XIV; Minn. Const., Art. I, § 7.  The due process protection provided under the Minnesota Constitution is "identical" to the protection provided by the U.S. Constitution.  Sartori v. Harnischfeger Corp., 432 N.W.2d 448, 453 (Minn. 1988).

"The possession of a protected life, liberty, or property interest is a condition precedent to invoking the government's obligation to provide due process of law." Stauch v. City of Columbia Heights, 212 F.3d 425, 429 (8th Cir. 2000).  A municipal ordinance may create a protected property interest "by establishing procedural requirements that impose substantive limitations on the exercise of official discretion."  Id. at 429–30 (finding a property interest in the renewal of a rental license derived from a municipal ordinance licensing scheme that required renewal be granted upon satisfaction of objective criteria).  Here, however, the ordinance's hearing requirement does not curtail the City's discretion in such a way as to create a protected property interest for the purposes of due process.  See Movers Warehouse Inc. v. City of Little Canada, 71 F.3d 716, 720 (8th Cir. 1995) (finding no property interest in the renewal of a bingo-hall license where "state law place[d] no substantive limitations on the discretion of the licensing authority").

As discussed above, the taxicab licensees do not have protected property interests in the market value of their licenses.  As such, the ordinance does not implicate the holders' property interests or, it follows, their due process rights.

C.  Unconstitutional Exaction

The Coalition further argues that the amended ordinance's application of new wheelchair-accessibility and fuel-efficiency standards is an unconstitutional exaction. See Dolan v. City of Tigard, 512 U.S. 374 (1994) (holding that the government could not, without just compensation, condition the approval of a building permit on the grant of a public easement when the condition had no essential nexus to the government's interest in the development).  The ordinance provision requiring wheelchair-accessible and alternative-fuel vehicles, however, applies to licensed service companies rather than to individual licensees.  In its complaint, the Coalition states that its members hold fully transferrable taxicab licenses; the Coalition does not allege that any of its members are, or are affiliated with, licensed service companies.

The Coalition now argues that because licensed service companies are necessarily made up of, and closely related to, individual taxicab licensees, the licensees will inevitably be injured by the change in the ordinance and therefore have standing, but the Coalition's deductive reasoning can take its argument only so far. While it may be true that an ordinance applied to licensed service companies necessarily affects the license holders affiliated with those companies, the Coalition has not alleged that any of its member–licensees are in fact affiliated with any licensed service company.

Because the Coalition's complaint does not allege a relationship between its member–licensees and the affected licensed service companies, we agree with the district court that the Coalition cannot show "injury in fact" and therefore does not have standing with respect to its unconstitutional-exaction claim.  See Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992).

## III.

For the foregoing reasons, we affirm the judgment of the district court.

_____