# IN THE UNITED STATES COURT OF APPEALS
## FOR THE FIFTH CIRCUIT

United States Court of Appeals
Fifth Circuit

**F I L E D**

December 18, 2012

No. 12-30921

Lyle W. Cayce
Clerk

DENNIS MELANCON, INCORPORATED, individually and on behalf of and as representative of all CPNC owners in the City of New Orleans; PATRICK MURPHY, individually and on behalf of and as representative of all CPNC owners in the City of New Orleans; ERIC HUSTED, individually and on behalf of and as representative of all CPNC owners in the City of New Orleans; WILLIAM KERNER, IV, The Succession of, individually and on behalf of and as representative of all CPNC owners in the City of New Orleans,

Plaintiffs-Appellees - Cross-Appellants

v.

CITY OF NEW ORLEANS,

Defendant-Appellant - Cross-Appellee

———————————————

MONROE COLEMAN; COLEMAN CAB COMPANY; PLACIDO CAB SERVICE, INCORPORATED; VETERANS CAB COMPANY, L.L.C.; PATIO CABS; U.S. CABS; NIRAN GUNASEKARA; WESNER DEROSIER; ALLIANCE CAB SERVICE, L.L.C.,

Plaintiffs-Appellees - Cross-Appellants

v.

CITY OF NEW ORLEANS,

Defendant-Appellant - Cross-Appellee

———————————————

CEDRIC RICHARD; POSTENE LOUISJEUNE; HERMAN W. WOODS; CALVIN LEVY; WILLIAM A. MARKS, INCORPORATED; VAHID HABIB; BOSNA EXPRESS, L.L.C.; PANAMERICA, L.L.C.; MATTA'S

No. 12-30921

TRANSPORTATION COMPANY; RAMSIS TRANSPORTATION, INCORPORATED; AIMAN GIBRIAL; PERLE DES ANTILLES, L.L.C.; EASTERN CAB, INCORPORATED; ROYAL CAB, INCORPORATED; JEANMARIE DESIR; MESSILIEN GEORGES; BRISSETTE, INCORPORATED; TRAVIS K. BRISSETTE; LIBERTY BELL CAB, L.L.C.; RIVERBEND CAB, L.L.C.; PELICAN CAB, L.L.C.; HALID HABIB; HAMPTON TRANSPORTATION AND CAB SERVICE CPNC 997, L.L.C.,

                              Plaintiffs-Appellees - Cross-Appellants

v.

PURA BASCOS; MALACHI HULL; CITY OF NEW ORLEANS,

                              Defendants-Appellants - Cross-Appellees

---

Appeals from the United States District Court
for the Eastern District of Louisiana

---

Before STEWART, Chief Judge, and KING and OWEN, Circuit Judges.

KING, Circuit Judge:

This case involves three consolidated lawsuits filed by plaintiffs who challenge the lawfulness of various ordinances enacted by the City of New Orleans regulating that city's taxicab industry. After the plaintiffs obtained from a Louisiana state court a temporary restraining order prohibiting enforcement of the ordinances, the City of New Orleans filed a motion for declaratory relief in federal court, seeking to dissolve the restraining order. The plaintiffs, in turn, moved for a preliminary injunction prohibiting enforcement of the ordinances. The district court granted in part and denied in part each motion, and both parties now appeal. For the reasons set forth below, we VACATE the district court's order insofar as it granted a preliminary injunction; we AFFIRM that order insofar as it denied a preliminary injunction; and we REMAND the case for further proceedings consistent with this opinion.

No. 12-30921

## I. FACTUAL AND PROCEDURAL BACKGROUND

In 1956, the City of New Orleans ("the City") passed various ordinances creating the regulatory framework within which the City's taxicab industry currently operates. Since that time, the industry has been heavily regulated. One important aspect of the City's regulatory framework is the requirement imposed by section 162-151 of the Municipal Code of Ordinances (the "Municipal Code") that a taxicab operator obtain from the City a certificate of public necessity and convenience ("CPNC") prior to operating a vehicle as a taxicab. Orleans Parish, La., Code of Ordinances § 162-151 (2000). Until 2009, section 162-186 limited to a total of 1,600 the number of CPNCs the City could issue. Orleans Parish, La., Code of Ordinances § 162-186 (2004). As a result of this limited supply, and because the City permitted CPNC holders to transfer their certificates for consideration, a secondary market developed for the exchange of CPNCs. While all CPNC transfers required approval by the City, a related ordinance provided that such approval would be granted upon the transferee's completion of various City-imposed requirements. Orleans Parish, La., Code of Ordinances § 162-321 (1995).

In April 2012, the City enacted various ordinances amending and adding to the regulatory framework governing the taxicab industry. Eight of those provisions are presently at issue: (1) section 162-58 prohibits the issuance of CPNCs for vehicles that previously have been used as taxicabs or law enforcement vehicles, or that have been titled as "salvage," "rebuilt," "junk," "total loss," or "reconditioned"; (2) section 162-59 provides that "CPNCs are privileges and not rights"; (3) section 162-321 allegedly makes previously mandatory transfers of CPNCs discretionary, and prohibits their transfer during the pendency of a suspension or revocation proceeding; (4) section 162-609 requires all taxicabs to maintain trip sheets for a two-year period; (5) section 162-613 places an age limit of eleven model years on vehicles used as taxicabs

3

No. 12-30921

beginning August 1, 2012, and seven model years beginning January 1, 2014;[1] (6) section 162-659 declares that all taxicabs must have credit/debit card machines equipped with Passenger Information Monitors that permit wireless communication to and from the taxicabs; (7) section 162-660 mandates that all taxicabs be equipped with a security camera; and (8) section 162-661 requires that taxicabs be fitted with global positioning systems ("GPS").

Shortly after the City enacted these ordinances, three groups of individuals and companies—all of whom either own or hold interests in CPNCs ("Plaintiffs")—filed separate lawsuits in state and federal court challenging the ordinances.[2] In particular, Plaintiffs asserted that sections 162-59 and 162-321, the ordinances declaring CPNCs to be "privileges and not rights" and allegedly making their transfer discretionary: (1) effected a regulatory taking under the Fifth Amendment, and (2) impaired the obligation of contract, in violation of the federal and Louisiana constitutions, as well as various Louisiana state laws. Plaintiffs further asserted that sections 162-58, 162-609, 162-613, 162-659, 162-660, and 162-661—all of which pertain to taxicab upgrade requirements ("the Upgrade Ordinances"): (1) violated the Fourteenth Amendment's Equal Protection Clause, (2) constituted excessive governmental regulation that imposed an unreasonable financial burden, (3) effected a regulatory taking under the Fifth Amendment, (4) violated the right to privacy, and (5) impaired the obligation of contract, in violation of the federal and Louisiana constitutions, as well as various Louisiana state laws.

---

[1] This provision also mandates that, as of January 1, 2013, no new or replacement taxicab vehicles can be operated as such if the vehicles are more than five model years old.

[2] Plaintiffs named as defendants the City of New Orleans; Pura Bascos, in her official capacity as Director of the Department of Safety and Permits; and Malachi Hull, in his official capacity as Director of the Taxicab and For Hire Vehicle Bureau. For convenience, the defendants also are referred to collectively as "the City."

No. 12-30921

On July 20, 2012, a Louisiana state court issued a temporary restraining order ("TRO") prohibiting the City from enforcing the challenged ordinances, most of which were due to take effect on August 1, 2012.  The underlying case subsequently was removed to the United States District Court for the Eastern District of Louisiana and consolidated with two related cases that also had been removed to, or were originally filed in, that court.  On July 27, 2012, the City filed a motion for declaratory relief, seeking a declaration dissolving the TRO.  Plaintiffs, in turn, moved for a preliminary injunction prohibiting enforcement of the ordinances.

After a two-day hearing, the district court granted in part and denied in part the City's motion for declaratory relief and Plaintiffs' motion for a preliminary injunction.  Underlying the court's ruling was its conclusion that Plaintiffs had satisfied the requirements for obtaining a preliminary injunction in connection with sections 162-59 and 162-321.  Most significantly, the court held that Plaintiffs had demonstrated a substantial likelihood of prevailing on their allegation that sections 162-59 and 162-321 affected protectable property rights—the CPNCs—upon which an unconstitutional regulatory taking had been imposed.    However, the court also concluded that Plaintiffs had not demonstrated a substantial likelihood of prevailing on their allegation that sections 162-59 and 162-321 constituted legislation impairing the obligation of contract, nor had they satisfied the requirements for obtaining a preliminary injunction in connection with their numerous allegations related to the Upgrade Ordinances.

The City appeals, arguing that the district court erred in holding that Plaintiffs demonstrated a substantial likelihood of prevailing on their allegation that CPNCs are protectable property and that sections 162-59 and 162-321 effect a regulatory taking.  Plaintiffs also appeal, claiming the district court erred by: (1) holding that they had not demonstrated a substantial likelihood of prevailing

5

No. 12-30921

on their claim that sections 162-59 and 162-321 constituted legislation impairing the obligation of contract, and (2) denying their motion for a preliminary injunction in connection with the Upgrade Ordinances. We expedited the briefing and also heard oral argument on an expedited basis.

## II. STANDARD OF REVIEW

We review a district court's ultimate decision to grant or deny a preliminary injunction for abuse of discretion.[3] *Janvey v. Alguire*, 647 F.3d 585, 591-92, 595 (5th Cir. 2011). "As to each element of the district court's preliminary-injunction analysis," however, "the district court's findings of fact 'are subject to a clearly-erroneous standard of review,' while conclusions of law 'are subject to broad review and will be reversed if incorrect.'" *Id.* at 592 (quoting *White v. Carlucci*, 862 F.2d 1209, 1211 (5th Cir. 1989)).

## III. ANALYSIS

"Generally, a movant must satisfy *each* of four traditional criteria in order to be entitled to a preliminary injunction: (1) irreparable injury[,] (2) substantial likelihood of success on the merits, (3) a favorable balance of hardships, and (4) no adverse effect on the public interest." *Black Fire Fighters Assoc. of Dall. v. City of Dallas*, 905 F.2d 63, 65 (5th Cir. 1990) (emphasis added). A preliminary injunction is an extraordinary remedy that "should not be granted unless the party seeking it has clearly carried the burden of persuasion on all four requirements." *Planned Parenthood Ass'n of Hidalgo Cnty. Tex., Inc. v. Suehs*, 692 F.3d 343, 348 (5th Cir. 2012) (quotation and citation omitted). Nonetheless, "given the haste that is often necessary" in addressing a motion for a

---

[3] In its order, the district court indicated that its consideration of the City's motion for declaratory judgment, which sought to dissolve the TRO, "would be functionally the same as a hearing on a motion for preliminary injunction." We agree, and the parties do not dispute this point. Accordingly, our opinion—though framed as a review of the district court's conclusions related to the preliminary injunction—also disposes of appeals related to the City's motion for declaratory relief.

preliminary injunction, "the findings of fact and conclusions of law made by a court granting a preliminary injunction are not binding at trial on the merits." *Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981).

## A.    The City's Appeal

On appeal, the City argues that the district court erred in concluding that Plaintiffs established a substantial likelihood of succeeding on the merits of their claim that sections 162-59 and 162-321 effected a regulatory taking.    In particular, the City maintains, contrary to the lower court's holding, that Plaintiffs are unlikely to prevail on the merits of their suit because (1) Plaintiffs hold no protectable property interest in their CPNCs, and (2) even if they do, sections 162-59 and 162-321 do not effect a taking of that interest.

As explained below, on this record, we agree that Plaintiffs have not demonstrated a substantial likelihood of prevailing on their argument that sections 162-59 and 162-321 effected a taking of property interests they hold in their CPNCs.

### (1)    The Ordinances at Issue

As noted, the ordinances at issue in connection with the City's appeal are sections 162-59 and 162-321.    In its entirety, section 162-59—as originally promulgated in April 2012—provides:

> Driver's permits and CPNCs are privileges and not rights.    The director of safety and permits or his designee has full discretion in determining whether a driver's permit or CPNC shall be issued.

Orleans Parish, La., Code of Ordinances § 162-59 (2012).

Section 162-321, on the other hand, pertains to the transferability of CPNCs.    Prior to April 2012, section 162-321 provided:

> Upon the sale or transfer of any taxicab or for hire vehicle . . . consideration may be received by the vendor or transferor or other person or paid thereto by the vendee or transferee for the transfer of the permit governing such vehicle. The CPNC *shall* be

transferred provided that the following requirements  are met . . . ."

Orleans Parish, La., Code of Ordinances § 162-321 (1995) (emphasis added). With the April 2012 amendment to section 162-321, the ordinance now states that "[t]he CPNC *may* be transferred provided that the following requirements are met."  Orleans Parish, La., Code of Ordinances § 162-321 (2012) (emphasis added).  Significantly, while most of the section's subparts remain the same, the amended ordinance also includes a new subsection, which provides:

> Before any transfer may become effective, the transferor and the transferee shall apply to the director who *shall* approve the transfer upon the determination that the transferee meets the qualifications of a CPNC holder under this chapter.

Orleans Parish, La., Code of Ordinances § 162-321(6) (2012) (emphasis added).

In brief, Plaintiffs argue that the 2012 versions of sections 162-59 and 162-321 effect a regulatory taking of property interests they hold in their CPNCs. In contrast, the City contends that no taking has occurred, because there was no constitutionally protectable property interest at stake.

**(2)    Applicable Law**

"The Takings Clause of the Fifth Amendment, made applicable to the States through the Fourteenth Amendment, directs that 'private property' shall not 'be taken for public use, without just compensation.'" *Urban Developers LLC v. City of Jackson*, 468 F.3d 281, 292 (5th Cir. 2006) (quoting U.S. Const. amend. V) (internal citation omitted).  Thus, to prevail on a takings claim, a plaintiff first must demonstrate that he has a protectable property interest. *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1000 (1984).  Because the Constitution protects rather than creates property interests, courts must "resort to 'existing rules or understandings that stem from an independent source such as state law' to define the range of interests that qualify for protection as 'property' under the Fifth and Fourteenth Amendments." *Lucas v. S.C. Coastal Council*, 505 U.S.

1003, 1030 (1992) (quoting *Bd. of Regents of State Colls. v. Roth*, 408 U.S. 564, 577 (1972)).

Determining what the "existing rules" are involves identifying "the group of rights inhering in the citizen's relation to [a] physical thing, as the right to possess, use and dispose of it." *United States v. Gen. Motors Corp.*, 323 U.S. 373, 377-78 (1945). As we previously have explained, under Louisiana law, the essential features of the "bundle of rights" commonly characterized as "property" are:

> (1) *usus*-the right to use or possess, i.e., hold, occupy, and utilize the property; (2) *abusus*-the right to abuse or alienate, i.e., transfer, lease, and encumber the property, and (3) *fructus*-the right to the fruits, i.e., to receive and enjoy the earnings, profits, rents, and revenues produced by or derived from the property.

*Rodrigue v. Rodrigue*, 218 F.3d 432, 436-37 (5th Cir. 2000).

Nevertheless, while state law generally defines what constitutes a property interest, "unwritten common law" or "policies and practices" also can rise to the level of creating "property interests." *Perry v. Sindermann*, 408 U.S. 593, 602-03 (1972) (internal quotation marks and citations omitted). In other words, the Fifth Amendment protects expectations arising not just from legislation or judicial precedent, but also those "spring[ing] from custom and practice." *Skip Kirchdorfer, Inc. v. United States*, 6 F.3d 1573, 1581 (Fed. Cir. 1993); *see also Nixon v. United States*, 978 F.2d 1269, 1276 (D.C. Cir. 1992) (observing that "property interests . . . may be created or reinforced through uniform custom and practice"); *Davis v. City of Chicago*, 841 F.2d 186, 188 (7th Cir. 1988) ("An established custom or policy may be used as evidence that a mutually explicit understanding exists."). "To have a property interest," however, "a person clearly must have more than an abstract need or desire for it. He must have more than a unilateral expectation of it. He must, instead, have a legitimate claim of entitlement to it." *Roth*, 408 U.S. at 577. "A

constitutional entitlement cannot be created—as if by estoppel—merely because a wholly and expressly discretionary state privilege has been granted generously in the past." *Conn. Bd. of Pardons v. Dumschat*, 452 U.S. 458, 465 (1981) (emphasis removed) (internal quotation marks and citation omitted).

### (3)    The "Existing Rules or Understandings" Related to CPNCs

In light of these principles, we must examine the "existing rules or understandings" surrounding CPNCs to ascertain the nature of the interest held (if any) in the certificates. As an initial matter, we note that the parties rely on a mix of legislation, judicial precedent, and custom to advance their arguments related to the character of the interest at stake. The City argues, for instance, that the heavily regulated nature of the taxicab industry undermines Plaintiffs' claim to any "entitlement" related to their CPNCs. Among other things, the City notes that it has the statutory authority to suspend and revoke CPNCs, to impose annual renewal requirements related thereto, and to designate routes over which CPNC vehicles may operate. Orleans Parish, La., Code of Ordinances §§ 162-52, 162-186, 162-248, 162-249. The City argues that these regulations are evidence of its longstanding position that CPNCs are privileges granted by the City, rather than constitutionally protected property rights.

Moreover, the City contends that its regulation of CPNCs took place against the backdrop of the Louisiana Supreme Court's decision in *Hutton v. City of Baton Rouge*, 47 So. 2d 665 (La. 1950). In *Hutton*, a bus driver who had been denied a CPNC to operate his business within Baton Rouge sought a writ of mandamus to compel the certificate's issuance. *Id.* at 666. The court explained that in Baton Rouge, a bus driver needed both a CPNC and a city "franchise" to operate a bus within city limits. *Id.* at 667. Because the plaintiff did not have a franchise, the court concluded that even if it compelled the city to issue a CPNC, the plaintiff still would not have been entitled to operate his bus within

the city. *Id.* at 668. The court thus affirmed the lower court's denial of the writ. *Id.* at 670.

Before reaching this conclusion, however, the court discussed the nature of the interest associated with a CPNC, explaining:

> A certificate of public convenience and necessity is in the nature of a personal privilege or license, which may be amended or revoked by the power authorized to issue it, and the holder does not acquire a property right. Such certificate is issued for the purpose of promoting the public convenience and necessity, and not for the purpose of conferring upon the holder any proprietary interest. The number of such certificates to be granted over a particular route may be limited by restricting the number of busses to the needs of the public, so as to occasion as little inconvenience as possible to the persons using the route and to insure to the holder of such certificate certain immunities from competition so that he may offer the public regular and continuous service. On the other hand, a franchise to use the streets in its usual sense is the right to use or occupy the streets for a stated period of time, for which a valuable consideration is paid, and contemplates a contract between the municipality and the individual to whom granted, and vests in the holder thereof a limited property right to use the public streets.

*Id.* at 668-69. The City argues that *Hutton*'s statement that a CPNC "is in the nature of a personal privilege or license" precludes the district court's conclusion that a holder can acquire a property interest in one.

Plaintiffs, in turn, emphasize that the regulatory framework at issue in *Hutton*—an opinion, they highlight, interpreting Baton Rouge's municipal code, not Louisiana state law—differed considerably from that at issue here. Plaintiffs underscore that unlike Baton Rouge, New Orleans does not have a dual requirement that a taxicab operator obtain both a CPNC and a franchise. Thus, they argue that, whereas Baton Rouge had a system separately providing for a CPNC (a thing "in the nature of a personal privilege") *as well as* a franchise (a thing vesting its holder with "a limited property right"), such is not the case in New Orleans. Rather, Plaintiffs submit, New Orleans has a single CPNC that

conveys both the license *and* the property interests associated with "the right to use or occupy the streets." *Id.* at 669.

In any event, Plaintiffs also maintain that the City's intervening treatment of CPNCs has undermined any force *Hutton* may have had and has imbued the certificates—largely by virtue of custom—with several features of "property." Until 2009, for example, the Municipal Code limited to a total of 1,600 the number of CPNCs the City could issue. Although this limitation is no longer statutorily in place, Plaintiffs adduced testimony as to the existence of a *de facto* moratorium under which the City has decided to issue no more than 1,600 certificates. Plaintiffs suggest that the limited availability of CPNCs has contributed to the development of the secondary market for their transfer, thereby vesting them with value. Indeed, Plaintiffs introduced evidence of a CPNC that sold for $67,000.

Relatedly, Plaintiffs contend that the City's practice of approving a CPNC transfer merely upon the transferee's completion of certain requirements likewise created a property interest in the certificates. In particular, Plaintiffs assert that this custom created an environment in which CPNC holders have conveyed their certificates upon their deaths and obtained loans using the market value of their CPNCs as collateral. To support this contention, Plaintiffs introduced evidence below as to the existence of a program whereby the Small Business Administration has provided loans to CPNC holders that were secured by the certificates themselves. Additionally, Plaintiffs introduced evidence that, in at least one instance, a CPNC was awarded as "property" in a divorce action.

Plaintiffs argue that these circumstances fostered the creation of property rights in CPNCs. Further, they maintain that as a result of these practices, a common understanding developed between CPNC holders and the City, such that it was mutually recognized that the property interests at stake were constitutionally protected. As evidence, Plaintiffs highlight that, historically,

when a CPNC was transferred from one person to another, the City issued a certificate titled "Change of Ownership." Moreover, in the City's CPNC transfer application, the current owner is instructed to list all persons with an "equitable interest" in the CPNC, including any beneficiary that might have an interest should the holder divorce or die. Finally, Plaintiffs introduced a 1991 opinion issued by the New Orleans City Attorney stating that "the CPNC, which grants the holder the right to operate a taxicab in the city, is a valuable right."

**(4)     Analysis**

At the outset of our analysis, we acknowledge the force with which the parties have advanced their arguments and the thoughtful disposition of the district court. Nevertheless, our review of the applicable law and the record before us compels us to conclude that the district court abused its discretion in holding that Plaintiffs demonstrated a substantial likelihood of succeeding on their assertion that sections 162-59 and 162-321 effected a taking of property interests Plaintiffs hold in their CPNCs. Here, the "existing rules or understandings" that define the dimensions of the interest associated with a CPNC evidence that the City historically has viewed and treated a CPNC as a privilege rather than a form of constitutionally protected property. Although City officials testified to this effect at the hearing below, our conclusion is most emphatically supported by the heavily regulated environment within which the New Orleans taxicab industry has operated.

As the Supreme Court has explained, "'takings' jurisprudence . . . has traditionally been guided by the understandings of our citizens regarding the content of, *and the State's power over*, the 'bundle of rights' that they acquire." *Lucas*, 505 U.S. at 1027 (emphasis added). In considering the government's authority over an interest, courts thus have held that a protected property interest simply "cannot arise in an area voluntarily entered into . . . which, from the start, is subject to pervasive Government control," because the government's

ability to regulate in the area means an individual "cannot be said to possess the right to exclude." *Mitchell Arms, Inc. v. United States*, 7 F.3d 212, 216 (Fed. Cir. 1993) (internal quotation marks, citations, and emphasis omitted); *Minneapolis Taxi Owners Coal., Inc. v. City of Minneapolis*, 572 F.3d 502, 509 (8th Cir. 2009) (citing *Mitchell Arms* with approval); *see also Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 435 (1982) ("The power to exclude has traditionally been considered one of the most treasured strands in an owner's bundle of property rights.").

We need not go that far, however, to conclude that Plaintiffs have not demonstrated a substantial likelihood of establishing that sections 162-59 and 162-321 effected a regulatory taking. For even in the absence of the April 2012 versions of sections 162-59 and 162-321, the City's authority to exercise control over CPNCs extends to such a degree that their holders possess, if anything, only a limited bundle of rights in connection therewith. For instance, the City has the statutory power, among other things, to impose various prerequisites on a CPNC applicant or transferee, and to suspend or revoke a CPNC.[4] Orleans Parish, La., Code of Ordinances §§ 162-181, 162-248, 162-249. The City also is authorized to designate routes over which CPNC holders may operate their vehicles, and to require that CPNCs be renewed annually. Orleans Parish, La., Code of Ordinances §§ 162-52, 162-186. Perhaps most importantly, the City has the discretion to adjust the number of CPNCs it issues.[5]

---

[4] To obtain a CPNC, a first time applicant or transferee must, *inter alia*, provide proof of citizenship or permanent residency, and successfully complete a detailed application, drug test, and background check. *See* Orleans Parish, La., Code of Ordinances § 181 *et seq.*

[5] Section 162-186, which previously limited to a total of 1,600 the number of CPNCs the City could issue, *see* Orleans Parish, La., Code of Ordinances § 162-186 (2004), was replaced *in toto* in 2009 with provisions that eliminated the cap. Orleans Parish, La., Code of Ordinances § 162-186 (2009).

No. 12-30921

As the *Hutton* court explained, these features all are hallmarks of a privilege rather than a property right.[6]  47 So. 2d at 668-69.  *Hutton* noted, for instance, that a CPNC "is in the nature of a personal privilege or license" *because* it "may be amended or revoked by the power authorized to issue it."  *Id.* at 668.  Similarly, the fact that the City may limit "[t]he number of such certificates to be granted over a particular route" evidences that CPNCs are "issued for the purpose of promoting the public convenience and necessity, and not for the purpose of conferring upon the holder any proprietary interest."  *Id.*

To be sure, as Plaintiffs argue, the City traditionally has permitted CPNC holders to transfer their certificates for consideration.  By so doing, the City tacitly has contributed to the development of a secondary market wherein CPNCs historically have attained significant value.  This does not, however, change our understanding of the fact that CPNC holders merely possess a "*license* to participate in the highly regulated taxicab market [that] is subject to regulatory change."  *Minneapolis Taxi Owners*, 572 F.3d at 509 (emphasis added).  Indeed, section 162-59 expressly states that CPNCs are *privileges*.[7]

Our conclusion is in accord with *Minneapolis Taxi Owners*.  There, a group of taxicab license holders challenged a Minneapolis ordinance removing that city's cap on the number of licenses it issued.  *Id.* at 504.  As here, licenses

---

[6] As mentioned, Plaintiffs raise several objections to the City's reliance on *Hutton*. Their arguments related to the factual distinctions between the New Orleans and Baton Rouge codes are well-taken.  Moreover, to the extent the City argues that *Hutton* supports the proposition that *all* CPNCs are personal privileges regardless of the attributes that might be vested in them, we agree with Plaintiffs that the City overreads the case.  Nevertheless, *Hutton*'s articulation of the features of a CPNC, together with its discussion as to whether those features equate to a privilege or a property right, is instructive.

[7] While the holder of a privilege or license may be entitled to certain procedural due process protections, *Wells Fargo Armored Serv. Corp. v. Ga. Pub. Serv. Comm'n*, 547 F.2d 938, 941 (5th Cir. 1977), here, Plaintiffs have challenged sections 162-59 and 162-321 under the Takings Clause rather than the Due Process Clause.  Moreover, we note that the Municipal Code currently provides for notice and an opportunity to be heard for denials, suspensions, and revocations of CPNCs.  Orleans Parish, La., Code of Ordinances §§ 162-248, 162-249.

15

granted by Minneapolis were transferrable and, because of the prior cap, a secondary market had developed for their sale. *Id.* The plaintiffs therefore argued that the ordinance removing the cap effected a regulatory taking, insofar as it destroyed the market value of taxicab licenses. *Id.* at 507. The Eighth Circuit rejected the plaintiffs' argument, however, concluding that the heavily regulated nature of the Minneapolis taxicab industry precluded the development of a property right of the nature claimed by the plaintiffs. *Id.* at 508-09. In particular, the court explained that Minneapolis always had held the authority to alter the number of licenses it issued, and "[s]o long as the government retains the discretion to determine the total number of licenses issued, the number of market entrants is indeterminate." *Id.* at 509 (alteration in original) (quoting *Members of Peanut Quota Holders Ass'n, Inc. v. United States*, 421 F.3d 1323, 1334 (Fed. Cir. 2005)). Thus, the court held that because the city's "highly regulated taxicab market [was] subject to regulatory change," any interest the taxicab license holders possessed did "not extend to the market value of the taxicab licenses derived through the closed nature of the City's taxicab market." *Id.*

We similarly conclude that whatever interest Plaintiffs hold in their CPNCs is the product of a regulatory scheme that also vests the City with broad discretion to alter or extinguish that interest. Indeed, although Plaintiffs allege that the April 2012 amendment to section 162-321 makes discretionary the previously mandatory transfer approval process, we note that even under the prior version of the ordinance, the City retained the right to impose various preapproval requirements. *See* Orleans Parish, La., Code of Ordinances § 162-321(3) (1995) (providing that "[t]he transferee shall submit an application for a CPNC to the bureau and *shall meet all requirements for same* in this chapter" (emphasis added)). In other words, even under the previous version of the ordinance, a transferee's ability to obtain a CPNC was bounded by the City's

regulatory framework—a framework that was subject to further change. Thus, while Plaintiffs interpret the pre-amended version of section 162-321 to require approval of CPNC transfers, the ordinance simply appears to have channeled the discretion of the City officials approving CPNC transfers. Moreover, as a factual matter, there is some dispute as to whether the amended version of section 162-321 even alters the landscape surrounding transfers to any significant degree, since the amendment also added a new subsection providing that the City "*shall* approve the transfer upon the determination that the transferee meets the qualifications of a CPNC holder under this chapter."[8] Orleans Parish, La., Code of Ordinances § 162-321(6) (2012) (emphasis added).

Simply put, we are of the view that sections 162-59 and 162-321 merely codify pre-existing law, which defined CPNCs as privileges subject to extensive regulation. Although it is true that a secondary market has developed based on the transferability of CPNCs, as we have explained, any resulting interest Plaintiffs hold in their CPNCs has emerged from a regulatory framework that itself allows the City to limit or revoke that interest. Such an interest does not fall within the ambit of a constitutionally protected property right, for it amounts to no more than a unilateral expectation that the City's regulation would not disrupt the secondary market value of CPNCs. *See Roth*, 408 U.S. at 577 (holding that a unilateral expectation does not constitute a constitutionally protected entitlement); *Peanut Quota Holders*, 421 F.3d at 1334-35 (explaining that holders of certain interests in heavily regulated areas "have no legally protected right against the government's making changes in the underlying program and no right to compensation for the loss in value resulting from the

---

[8] Of course, as Plaintiffs note, the new subsection also provides that "[n]o CPNC may be transferred if suspension or revocation proceedings are pending with the bureau." Orleans Parish, La., Code of Ordinances § 162-321(6) (2012). There appears to be no question that this is a new limitation on the transferability of CPNCs.

changes"). Moreover, in light of this highly regulated environment, while Plaintiffs have pointed to other evidence that purportedly suggests the development of a custom by which the City treated CPNCs as property, the current isolated nature of this evidence is insufficient to establish the type of mutually explicit understanding necessary to create a protectable property right under the Takings Clause. *See Davis*, 841 F.2d at 188-89.

Accordingly, on this record, we hold that the district court abused its discretion in concluding that Plaintiffs demonstrated a substantial likelihood of prevailing on their claim that sections 162-59 and 162-321 effected a regulatory taking. We therefore vacate the district court's order insofar as it granted Plaintiffs' motion for a preliminary injunction prohibiting enforcement of sections 162-59 and 162-321.

## B.    Plaintiffs' Appeal

As previously noted, Plaintiffs also allege that sections 162-59 and 162-321 constitute legislation impairing the obligation of contract. Plaintiffs therefore sought, under that theory, a preliminary injunction prohibiting enforcement of the ordinances. On appeal, Plaintiffs challenge the district court's conclusion that they did not demonstrate a substantial likelihood of prevailing on this claim, and thus were not entitled to the preliminary injunction in connection therewith. Plaintiffs also appeal the district court's denial of their motion for a preliminary injunction prohibiting enforcement of the Upgrade Ordinances. These challenges will be addressed in turn, though we note at the  outset that "[t]he denial of a preliminary injunction will be upheld where the movant has failed sufficiently to establish *any one* of the [necessary] four criteria." *Black Fire Fighters*, 905 F.2d at 65.

### (1)    Plaintiffs' Impairment of Contract Claim

In connection with their impairment of contract claim, Plaintiffs allege that sections 162-59 and 162-321 breach "contracts" between themselves and the

government, and thus amount to an unconstitutional enactment of *ex post facto* laws that interfere with those contracts.  In essence, Plaintiffs contend that the statutory scheme regulating the taxicab industry—as enacted by the City and the State of Louisiana—constituted an offer to enter into the taxicab business, subject only to certain clearly understood terms and conditions.  Plaintiffs further argue that by purchasing CPNCs, they accepted the offer and thereby entered into binding contracts with the City and the State of Louisiana.  According to Plaintiffs, the regulations at issue breached those contracts, and therefore constitute unconstitutional legislation impairing the obligation of contract.  For the reasons discussed below, we conclude that the district court properly rejected this argument.

The statutory framework on which Plaintiffs rest their argument is primarily found in Louisiana Revised Statutes sections 45:200.1 through 200.17—Louisiana's Public Passenger Motor Vehicle Responsibility Law—and section 33:4792.  Section 45:200.1 declares "that the health, safety, morals and welfare of the public make it imperative that effective, uniform, reasonable and just supervision, regulation and control be exercised over the operation of" public carrier vehicles. La. Rev. Stat. Ann. § 45:200.1.  Section 45:200.3 mandates that such vehicles cannot be operated until the owner receives a CPNC from the applicable authority, and section 200.7 provides that the certificates "*shall* be effective, and operation *shall* be permitted thereunder" so long as the holder satisfies certain conditions.  La. Rev. Stat. Ann. §§ 45:200.3, 200.7 (emphases added).  Finally, section 33:4792 declares that "[t]he economic viability and stability of" privately operated for-hire vehicles is "a matter of statewide importance." La. Rev. Stat. Ann. § 33:4792.

Plaintiffs assert that they obtained and invested in their CPNCs in reliance on these provisions.  More to the point, Plaintiffs submit that these statutes created an offer with clear terms and conditions that guarantees them

the right to acquire and utilize their CPNCs, subject only to various conditions with which they allegedly have complied. While acknowledging that the City has the duty to protect the public and the taxicab industry by enacting appropriate regulations, Plaintiffs contend that the City failed to do so in a reasonable and just way, and commensurately neglected the important state interest in the economic viability and stability of the industry. Ultimately, Plaintiffs allege that in enacting sections 162-59 and 162-321, the City breached the "contracts" created by this statutory framework and thereby violated Article I, Section 10 of the United States Constitution, as well as Article I, Section 23 of the Louisiana Constitution—both of which prohibit the enactment of legislation that impairs the obligation of contracts.

In advancing this argument, Plaintiffs rely on *Russell v. Sebastian*, 233 U.S. 195 (1914). There, the Supreme Court considered a provision of the California Constitution of 1879, which granted "any individual, or any company duly incorporated for such purpose . . . the privilege of using the public streets and thoroughfares thereof, and of laying down pipes and conduits therein, and connections therewith," as necessary for supplying "illuminating light" or fresh water. *Id.* at 198. In 1911, this provision had been amended to state that "[p]ersons or corporations may establish and operate works for supplying the inhabitants with such services upon such conditions and under such regulations as the municipality may prescribe under its organic law." *Id.* at 198-99. Pursuant to this revision, the City of Los Angeles passed an ordinance requiring utility providers to obtain a grant from the city prior to commencing the excavation activities necessary for installing utility pipes and conduits. *Id.* at 199. The plaintiff challenged the ordinance and the constitutional amendment under which it was promulgated, arguing that they impaired the obligation of contracts formed prior to their enactment. *Id.* at 199-200.

In addressing the plaintiff's claim, the *Sebastian* Court explained that the California Supreme Court previously had construed the 1879 constitutional provision as a "direct grant" limited only by the requirements of the provision itself. *Id.* at 203-04. Likewise, the state supreme court previously had explained that the privilege contained therein could "be accepted by any person, or by any company." *Id.* at 204. Accordingly, the Court stated that "[w]hen the voice of the state declares that it is bound if its offer is accepted, and the question simply is with respect to the scope of the obligation, we should be slow to conclude that only a revocable license was intended." *Id.* Hence, the Court held that "the grant, resulting from an acceptance of the state's offer, constituted a contract, and vested in the accepting individual or corporation a property right, protected by the Federal Constitution." *Id.*

As noted, Plaintiffs read *Sebastian* to support their conclusion that the referenced statutory scheme created by the City and the State of Louisiana constituted a contractual offer to enter into the taxicab business. Nevertheless, their reliance on *Sebastian* is misplaced. First, unlike in *Sebastian*, no court has declared the statutory scheme at issue here to constitute an offer. More fundamentally, in contrast to *Sebastian*, the statutes on which Plaintiffs rely do not contain an absolute grant related to the taxicab industry that may be construed as a contract. Indeed, nothing in the statutes cited by Plaintiffs demonstrates an intent on the part of the City or the State of Louisiana to extend to those in the taxicab industry an offer of a contractual nature. *See U.S. Trust Co. of N.Y. v. New Jersey*, 431 U.S. 1, 17 n.14 (1977) ("In general, a statute is itself treated as a contract [only] when the language and circumstances evince a legislative intent to create private rights of a contractual nature enforceable against the State.").

Accordingly, we conclude that there is no basis for finding that a contract exists between Plaintiffs and the City or the State of Louisiana. The district

court therefore did not abuse its discretion in holding that Plaintiffs failed to demonstrate a substantial likelihood of establishing that sections 162-59 and 162-321 constitute legislation impairing the obligation of contract. Furthermore, having so concluded, we may also dispose of Plaintiffs' claim that the Upgrade Ordinances impair contracts into which they have entered with the City and State of Louisiana, as that claim necessarily depends, in the first instance, on the presence of contracts. We therefore affirm the district court's denial of a preliminary injunction in connection with all aspects of Plaintiffs' impairment of contract claim.

### (2) Plaintiffs' Remaining Challenges to the Upgrade Ordinances

Plaintiffs also appeal, on other grounds, the district court's conclusion that they were not entitled to a preliminary injunction prohibiting enforcement of the Upgrade Ordinances. Again, the ordinances included in this category: (1) declare that certain vehicles may not be used as taxicabs, (2) require taxicabs to maintain trip sheets for a two-year period, (3) place certain age limits on vehicles used as taxicabs, (4) require taxicabs to have credit/debit card machines equipped with Passenger Information Monitors that permit wireless communication, (5) mandate that taxicabs be equipped with a security camera, and (6) require taxicabs to be fitted with GPS devices.

### (a) Background Discussion

The City asserts that the Upgrade Ordinances largely were enacted to advance the City's legitimate interest in ensuring the safety of its citizens and visitors. The ordinance requiring credit/debit card machines, for instance, purportedly was enacted based on the City's perspective that taxicab drivers would carry less cash if the machines were installed, and therefore would be less likely targets of criminal activity. Likewise, the City introduced evidence that the ordinance requiring security cameras was motivated by the City's concern for passenger and driver safety, as those involved in the taxicab industry often

work alone, at night, and in high-crime areas, and cameras have been shown to have a deterrent effect on crime.

The City also argues that its interest in the safety of taxicab riders and drivers precipitated the ordinance that places an age limit of eleven model years on vehicles used as taxicabs.[9] More particularly, the City's position is that newer vehicles advance public welfare because they are equipped with modern safety features such as multiple air bags and online diagnostic systems. Further, the City also argues that the ordinance advances safety insofar as the diagnostic systems alert a driver as to when a vehicle needs to be serviced, thereby helping to prevent unexpected breakdowns.

Other evidence suggested that the Upgrade Ordinances also were enacted to promote hospitality and tourism in New Orleans. The GPS requirement, for example, ostensibly was based on the City's desire to provide passengers with efficient navigation and a means to ensure that taxicab drivers charge passengers a proper fare. The ordinance mandating retention of trip sheets was designed to provide the City with information about the operations of the taxicab industry, including the number of passengers transported on a daily basis. City officials further testified that trip sheets also help to ensure that drivers are not illegally operating taxicabs.

Notwithstanding these arguments, Plaintiffs maintain that the Upgrade Ordinances effect a regulatory taking, violate the Equal Protection Clause, and constitute "excessive and unreasonable governmental regulation."[10] In particular, Plaintiffs contend that the Upgrade Ordinances constitute a

---

[9] As previously noted, the age limit is lowered to seven model years beginning January 1, 2014.

[10] Although Plaintiffs also allege that the Upgrade Ordinances impair contracts created by the regulatory framework surrounding the taxicab industry, we have, as explained, already disposed of that claim.

regulatory taking because they require taxicab owners and drivers to expend considerable resources to comply with the ordinances' requirements. Most forcefully, Plaintiffs advance several arguments to support their claim that the ordinances violate the Equal Protection Clause. First, they allege that the ordinances requiring taxicabs operators to maintain trip sheets and to equip their vehicles with credit/debit card machines, security cameras, and GPS devices are not rationally related to a legitimate governmental purpose. Second, Plaintiffs submit that the ordinance setting a maximum vehicle age violates the Equal Protection Clause because it does not apply to other for-hire vehicles, and there is no rational basis for such disparate treatment. Finally, Plaintiffs allege that the ordinance placing an eleven-year age limit on taxicabs is not rationally related to a legitimate governmental purpose but is, instead, "totally arbitrary." In challenging the vehicle age ordinance, Plaintiffs suggest that mileage is a better and more accurate indicator of age than model year. This is especially true, Plaintiffs argue, in cities like New Orleans—with a seasonal customer base—since taxicabs in such areas average significantly fewer miles per year than taxicabs in other major metropolitan areas.

**(b)    Analysis**

Despite the compelling nature of the parties' arguments, we are mindful of the current posture of the case. It is not our role, in other words, to decide the merit of these arguments.[11] Rather, we must affirm the district court's denial of a preliminary injunction if Plaintiffs failed to satisfy any one of the required criteria for obtaining such relief. *Black Fire Fighters*, 905 F.2d at 65. Here, the

---

[11] We observe, however, that Plaintiffs have advanced a particularly forceful argument that the City's rational basis for section 162-613—the ordinance placing an eleven-year age limit on vehicles used as taxicabs—is unclear.

district court concluded that Plaintiffs failed to establish that they would be irreparably injured by the denial of an injunction.[12]  We agree.

Plaintiffs have alleged that, in the absence of a preliminary injunction, the significant costs of complying with the Upgrade Ordinances will cause irreparable injury.  In particular, they assert that, to achieve full compliance with the ordinances, taxicab owners will be required to expend between $25,000 and $40,000.  Moreover, in light of the new vehicle age limits, Plaintiffs contend that over 60% of the taxicab industry will be required to replace their vehicles by January 1, 2013—a burden, they submit, that many members of the industry will be unable to meet.

The City takes issue with Plaintiffs' facts.  Specifically, it contends that the evidence indicates that the cost of complying with the ordinances actually is only about $2,000.[13]  Further, the City suggests to us that approximately 75% of the City's taxicab industry already is in compliance with the vehicle age requirements.

Regardless of the dispute surrounding these allegations, however, Plaintiffs' argument is legally insufficient to establish that they would be irreparably injured in the absence of an injunction.  "Federal courts have long recognized that, when 'the threatened harm is more than de minimis, it is not so much the magnitude but the *irreparability* that counts for purposes of a preliminary injunction.'" *Enter. Int'l, Inc. v. Corporacion Estatal Petrolera Ecuatoriana*, 762 F.2d 464, 472 (5th Cir. 1985) (emphasis added) (quoting *Canal Auth. v. Callaway*, 489 F.2d 567, 575 (5th Cir. 1974)).  It is thus well-established

---

[12] Although the district court concluded that Plaintiffs also failed to satisfy all other requirements for injunctive relief in connection with the Upgrade Ordinances, we express no view on the remainder of the court's analysis.

[13] We note, however, that as Plaintiffs maintain, it appears that the City's estimate does not include the costs associated with acquiring newer vehicles.

that an injury is irreparable only "if it cannot be undone through monetary remedies." *Interox Am. v. PPG Indus., Inc.*, 736 F.2d 194, 202 (5th Cir. 1984); *see also Deerfield Med. Ctr. v. City of Deerfield Beach*, 661 F.2d 328, 338 (5th Cir. 1981); *Spiegel v. City of Houston*, 636 F.2d 997, 1001 (5th Cir. 1981); *Parks v. Dunlop*, 517 F.2d 785, 787 (5th Cir. 1975). "Mere injuries, however substantial, in terms of money, time and energy necessarily expended in the absence of [an injunction], are not enough. The possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, [weighs] heavily against a claim of irreparable harm." *Morgan v. Fletcher*, 518 F.2d 236, 240 (5th Cir. 1975) (quoting *Va. Petroleum Jobbers Ass'n v. Fed. Power Comm'n*, 259 F.2d 921, 925 (D.C. Cir. 1958)).

Here, the costs of complying with the Upgrade Ordinances, though disputed at this juncture, can be ascertained with precision at a later hearing. In other words, should Plaintiffs ultimately prevail on the merits of their suit, they have recourse—in the form of subsequent civil suits against the City—to recover the amounts they erroneously will have expended to comply with the ordinances.[14] Thus, because Plaintiffs only alleged harm can be obviated by

---

[14] Contrary to the district court's order, there is some question as to whether this would be true of Plaintiffs' impairment of contract claim. *Compare Carter v. Greenhow*, 114 U.S. 317, 322 (1885) (holding that "the only right secured" by the Contract Clause is the "right to have a judicial determination declaring the nullity of the attempt to impair [the] obligation"), *and Crosby v. City of Gastonia*, 635 F.3d 634, 640 (4th Cir. 2011) ("[R]ecourse to § 1983 for the deprivation of rights secured by the Contracts Clause is limited to the discrete instances where a state has denied a citizen the opportunity to seek adjudication through the courts as to whether a constitutional impairment of a contract has occurred, or has foreclosed the imposition of an adequate remedy for an established impairment. Section 1983 provides no basis to complain of an alleged impairment in the first instance."), *with Dennis v. Higgins*, 498 U.S. 439, 451 n.9 (1991) (explaining that the Supreme Court has given *Carter* "a narrow reading" based on the nature of the *Carter* plaintiff's pleading), *and S. Cal. Gas Co. v. City of Santa Ana*, 336 F.3d 885, 887 (9th Cir. 2003) (holding that the deprivation of rights secured by the Contract Clause may "give rise to a cause of action under section 1983" and that *Carter* "is not to the contrary"). Nevertheless, we need not resolve the issue here, and we express no view in connection with it. As we already have discussed, Plaintiffs failed to establish a substantial likelihood of succeeding on the merits of their impairment of contract claim, and

monetary relief, it does not constitute the "irreparable" injury necessary to obtain the extraordinary relief of a preliminary injunction.[15]

Accordingly, we conclude that the district court did not abuse its discretion in holding that Plaintiffs failed to demonstrate that they would be irreparably injured by the denial of an injunction. We therefore affirm the district court's order insofar as it denied Plaintiffs' request for a preliminary injunction enjoining enforcement of the Upgrade Ordinances.

## IV. CONCLUSION

In light of the foregoing, we VACATE the district court's order insofar as it granted a preliminary injunction; we AFFIRM that order insofar as it denied a preliminary injunction; and we REMAND the case for further proceedings consistent with this opinion. Plaintiffs shall bear the costs of this appeal. The mandate shall issue forthwith.

---

it is on that basis that we affirm the district court's denial of a preliminary junction.

[15] We observe, for the sake of comprehensiveness, that Plaintiffs alleged in the lower court that requiring them to install GPS devices, credit/debit card machines, and security cameras violated their right to privacy. While the district court properly explained that this allegation *could* form the basis of a claim of "irreparable injury," *see Deerfield*, 661 F.2d at 338, the court concluded that Plaintiffs did not have a substantial likelihood of succeeding on their right to privacy claim. We need not address that issue here, however, as Plaintiffs have waived or abandoned that claim on appeal by failing to address it in their briefs. *See Al-Ra'id v. Ingle*, 69 F.3d 28, 31 (5th Cir. 1995) ("An appellant's brief must contain an argument on the issues that are raised, in order that we, as a reviewing court, may know what action *of the district court* is being complained of.").