# Supreme Court of Florida

_____

No. SC2023-0095

_____

**GUSTAVO BOJORQUEZ, etc., et al.,**
Petitioners,

vs.

**STATE OF FLORIDA, et al.,**
Respondents.

June 5, 2025

MUÑIZ, C.J.

For several decades starting in the 1970s, the Legislature maintained a special district to regulate the taxicab business in Hillsborough County. A 2012 law declared the business licenses issued by the district to be the "private property" of their holders and allowed holders to transfer and devise those licenses. A 2017 law repealed the 2012 law, dissolved the district, and sent taxicab regulation back to Hillsborough County, which chose not to recognize the district-issued licenses. This case is about whether the 2017 repeal implicates the Florida Constitution's Takings

Clause.  We hold that it does not.

I

A

Traditionally, Florida's counties and cities have been responsible for any regulation of the taxicab business in their jurisdictions.  From 1976 to 2017, though, Hillsborough County and its cities stood as an exception to the rule.  There, the exclusive authority to regulate taxicabs fell to the Hillsborough County Public Transportation Commission (PTC), a countywide independent special district created by the Legislature.

The PTC's charter made it illegal to engage in the taxicab business in Hillsborough County and its cities without first obtaining a PTC-issued certificate and one or more permits. Ch. 2001-299, § 7(1), Laws of Fla.  A "certificate" was defined as "the written authority granted by the commission by its order to operate one or more [taxicabs]."  *Id.* § 3(5).  A "permit" meant "a license issued by the commission to allow the operation of a particular [taxicab] for which a certificate ha[d] been issued."  *Id.* § 3(20).  Chapter 2001-299 instructed the PTC to issue certificates and permits based on the commission's determination of "public

- 2 -

convenience and necessity," and it authorized the PTC to set a county-population-based cap on the total number of outstanding permits. *Id.* § 5(1)(i), (2)(v). Importantly, the law also empowered the PTC to "[r]efuse to issue or renew and suspend or revoke" a certificate or permit. *Id.* § 5(2)(dd).

Before 2012, the PTC's charter said nothing about a holder's property rights (if any) in a certificate or permit, or about whether the holder could sell or transfer those instruments. That changed when the Legislature enacted chapter 2012-247, Laws of Florida. The 2012 law declared that already-issued and future certificates and permits are "the private property of the holder of such certificate or permit." Ch. 2012-247, § 1(2), Laws of Fla. And it said that, subject to PTC approval, certificate and permit holders "may transfer the certificate or permit by pledge, sale, assignment, sublease, devise, or other means of transfer to another person." *Id.* § 1(3). The 2012 law also adopted (in statute) the PTC's then-existing population cap on permits. *Id.* § 1(4). Finally, chapter 2012-247 expressly superseded any "inconsistent" provisions in chapter 2001-299—but it did not specifically identify any such provisions. *Id.* § 1(1).

That is how things stood until 2017, when the Legislature dissolved the PTC. Chapter 2017-198 repealed the PTC's enabling legislation, including the 2001 charter and the 2012 law that had declared PTC-issued certificates and permits to be the "private property" of the holder. Ch. 2017-198, § 2, Laws of Fla. The 2017 law did not expressly address the continued legal status (if any) of the existing PTC-issued certificates and permits; did not expressly require Hillsborough County or any of its cities to honor those certificates and permits; and did not tell the county and cities whether or how to regulate the taxicab business in the absence of the PTC. Nor did chapter 2017-198 say anything about compensation for holders of PTC-issued certificates and permits.

When the Legislature dissolved the PTC, Hillsborough County regained the regulatory authority over taxicabs that Florida law gives counties generally. *See* § 125.01(1)(n), Fla. Stat. (2024). Armed with that authority, and understanding itself to be writing on a blank slate, the county chose to adopt a replacement regulatory regime. Hillsborough County Code §§ 10-576 to -601 (2017). The county's new taxicab ordinance did not recognize the PTC-issued certificates and permits. *Id.* § 10-582(a). Instead, the

county required all businesses to apply for new certificates and permits, allowing existing certificate and permit holders to continue their operations during the application process. *Id.* Notably, the county's taxicab ordinance expressly stated that holders of the new county-issued certificates and permits would have "no proprietary interest" in those instruments. *Id.* § 10-578.

B

The plaintiffs in this case are several taxicab companies that previously held PTC-issued certificates and permits. *Gulf Coast Transp., Inc. v. Hillsborough Cnty.* (*Gulf Coast*), 352 So. 3d 368, 373 (Fla. 2d DCA 2022). Their operative complaint alleged that the State and Hillsborough County effected a taking of those certificates and permits without compensation, in violation of the Florida Constitution's Takings Clause. *Id.*; art. X, § 6(a), Fla. Const. The plaintiffs maintained that they purchased their PTC-issued certificates and permits at substantial cost, and that those instruments now convey no legal benefit and are valueless. They further alleged that the county's new regulatory regime conveys no property rights in the replacement certificates and permits. The plaintiff taxicab companies did not allege that the county has

- 5 -

denied them new certificates and permits, or that the county has prevented them from continuing to carry on their taxicab businesses. *Gulf Coast*, 352 So. 3d at 373.

Hillsborough County and the State sought summary judgment and dismissal of the taxicab companies' complaint, respectively. *Id.* The county argued that the State was responsible for any taking that might have occurred, because it was the State that granted and then repealed any property rights in the PTC-issued certificates and permits. The State maintained that no taking had occurred, because the taxicab companies were still in business; and it said that, even if there was a taking, it was the county's fault.

The trial court granted the county's motion for summary judgment. *Gulf Coast*, 352 So. 3d at 374. It concluded that there were no certificates or permits for Hillsborough County to take, because those instruments "had, in essence, vanished" when the State dissolved the PTC. *Gulf Coast Transp., Inc. v. Hillsborough Cnty.*, No. 2019-CA-6391, at 2 (Fla. 13th Cir. Ct. Apr. 1, 2020). But the court denied the State's motion to dismiss. *Id.* at 1. It reasoned that, "because Florida acting within its power did cause the demise

- 6 -

of the PTC and, thus, its medallions or certificates, Plaintiffs may have claims for damages against Florida." *Id.* at 2.

The taxicab companies and the State both appealed the final judgment in favor of Hillsborough County. Invoking Florida Rule of Appellate Procedure 9.110(k), the State also appealed the nonfinal order denying its motion to dismiss. *See Gulf Coast*, 352 So. 3d at 374. Rule 9.110(k) allows an appellate court to review rulings "directly related to an aspect of the partial final judgment under review."

Over a strong dissent, the Second District Court of Appeal held that the taxicab companies "did not have a property interest [in the PTC-issued certificates and permits] for purposes of the Takings Clause." *Gulf Coast*, 352 So. 3d at 371. The court therefore affirmed the final judgment in favor of the county and reversed the trial court's denial of the State's motion to dismiss. *Id.* The taxicab companies then petitioned for this Court's review of the Second District's decision as it related to the State, but not the county. We accepted jurisdiction. *See* art. V, § 3(b)(3), Fla. Const.

## II

The taxicab companies seek relief only under our state constitution's Takings Clause.[1]  It reads: "No private property shall be taken except for a public purpose and with full compensation therefor paid to each owner or secured by deposit in the registry of the court and available to the owner."  Art. X, § 6(a), Fla. Const. The threshold question here is whether the taxicab companies' PTC-issued certificates and permits were "private property" for purposes of that provision.  If not, the taxicab companies cannot prevail.

The Second District answered no and gave two basic reasons for its conclusion: (1) notwithstanding the "private property" label that the 2012 law attached to PTC-issued certificates and permits, those instruments remained "privileges or licenses" that the State could revoke without paying compensation; and (2) the Florida Takings Clause does not protect a *subject* of property rights (i.e., the "thing" to which property rights attach) that is itself "created by or derived from state law."  *Gulf Coast*, 352 So. 3d at 375-79.  In its

---

1.  This case does not require us to consider any rights that holders of PTC-issued certificates and permits might have held under the federal or state due process clauses.

- 8 -

briefing before our Court, the State has opted not to defend the district court's second rationale: "The State does not contend . . . that a statutory interest can never be compensable property." *See* State of Florida's Answer Brief 19 n.10.

The taxicab companies urge us simply to compare the language of chapter 2012-247 to the language of the Florida Takings Clause. They emphasize that the 2012 law declared PTC-issued certificates and permits to be the "private property" of their holders. *See* ch. 2012-247, § 1(2), Laws of Fla. And they add that, by expressly allowing holders to transfer and devise that property, the Legislature conferred traditional incidents of ownership and bolstered "the plain textual meaning." Initial Brief of Petitioners 32.

The taxicab companies describe the 2012 law as a straightforward legislative grant of "private property" that carried an implicit promise not to rescind the grant without paying compensation. *Id.* at 14-20. To support that argument, the companies lean heavily on an analogy between (1) PTC-issued certificates and permits and (2) government franchises to operate things like ferries, toll roads, and railroads. *See, e.g.*, *id.* at 15-21. It is true that, depending on the terms of the grant, such franchises

historically could enjoy constitutional protection as contracts and property. *See, e.g., Leonard v. Baylen St. Wharf Co.*, 52 So. 718, 719 (Fla. 1910) (right to use wharf franchise was a property right of the grantee).

Although the taxicab companies' arguments are not without force, we find them unpersuasive. We do not doubt that certificate- and permit-holders had certain property rights in their PTC-issued instruments—they could engage in the taxicab business, and they could use, transfer, pledge, and devise their certificates and permits. But, where the property rights at issue find their source in a government grant, the label "private property" does not tell us everything we need to know about the State's ultimate control over the continued existence of any rights conveyed in the grant.

For property of this nature to enjoy protection from an uncompensated taking, the government must have conferred the property on an irrevocable basis, for at least some specified period. Only then will our constitution require payment if the grantor government subsequently withdraws the property right within that period. "The government is free to create programs that convey benefits in the form of property, but, unless the statute itself or

surrounding circumstances indicate that such conveyances are intended to be irrevocable, the government does not forfeit its right to withdraw those benefits or qualify them as it chooses." *Members of the Peanut Quota Holders Ass'n, Inc. v. United States*, 421 F.3d 1323, 1335 (Fed. Cir. 2005); *see also Dames & Moore v. Regan*, 453 U.S. 654, 674 n.6 (1981) (no compensable property interest where government-granted attachments were revocable and contingent). Indeed, based on a comprehensive survey of federal takings law, Professor Thomas W. Merrill concluded that "takings property must be irrevocable for a predetermined period of time, and there must be no understanding, explicit or implicit, that the legislature has reserved the right to terminate the interest before this period of time elapses." Thomas W. Merrill, *The Landscape of Constitutional Property*, 86 Va. L. Rev. 885, 978 (2000).

We find these federal precedents informative and persuasive about this baseline requirement for government-granted property to warrant protection in the takings context. Although there are some textual differences between the Florida and Federal Takings Clauses, the terms relevant to this case—"private property" and "taken"—are the same in both provisions. Importantly, neither side

argues that we should interpret or implement the Florida Takings Clause in a state-law-specific way, and both rely extensively on precedents interpreting the Federal Takings Clause. *Cf. St. Johns River Water Mgmt. Dist. v. Koontz*, 77 So. 3d 1220, 1226 (Fla. 2011) (describing this Court as having interpreted the federal and Florida takings clauses "coextensively"), *rev'd on other grounds*, 570 U.S. 595 (2013).

To determine whether the Legislature granted irrevocable property rights in PTC-issued certificates and permits, we look to chapter 2012-247. And we must read that law together with the PTC's underlying charter, chapter 2001-299, because both laws were parts of the integrated statutory scheme that governed the PTC. It is undisputed that the statutory framework governing the PTC is the only source of any property interests that could have accompanied PTC-issued certificates and permits. That is because, like its Fifth Amendment counterpart, Florida's Takings Clause protects property rights but does not create property interests in the first instance. *See, e.g.*, *Webb's Fabulous Pharmacies, Inc. v. Beckwith*, 449 U.S. 155, 161 (1980) (property interests "are created and their dimensions are defined by existing rules or

understandings" derived from independent sources of law (quoting *Bd. of Regents v. Roth*, 408 U.S. 564, 577 (1972))).

For several reasons, we conclude that the Legislature retained the discretion to revoke any property rights that it conveyed in chapter 2012-247. Most importantly, chapter 2012-247 did not expressly repeal the charter provision saying that PTC-issued certificates and permits are revocable and subject to nonrenewal. *See* ch. 2001-299, § 5(2)(dd), Laws of Fla. That charter provision does not appear to require that the PTC's nonrenewal or revocation of a certificate or permit be based on cause.

It is true that the 2012 law included a repeal of unspecified "inconsistent" provisions in the PTC's 2001 charter. Ch. 2012-247, § 1(1), Laws of Fla. But we do not think the Legislature would speak only implicitly to an issue as basic as the permanence of the rights embodied in PTC-issued certificates and permits. And any uncertainty about the extent of the Legislature's grant cuts against the taxicab companies. The "rule applicable to all grants by the government" is "that they are to be strictly construed, or be taken most beneficially in favor of the state or public, and against the

grantee." *State v. Black River Phosphate Co.*, 13 So. 640, 648 (Fla. 1893) (collecting cases).

The legal backdrop against which the Legislature enacted chapter 2012-247 also informs and supports our conclusion. Our state's longstanding tradition tells us that permission to engage in the taxicab business is a revocable privilege. That has been true regardless of the legal label or form attached to the permission slip. As this Court said long ago:

> There is then no such thing as a natural right to use the public highways for commercial purposes. Such limited right as the public may grant to use them for private business is merely a privilege that may be restricted or withdrawn at the discretion of the granting power. Whether the grant is by license, permit, or franchise is immaterial; the power to do so is plenary and may extend to absolute prohibition.

*Jarrell v. Orlando Transit Co.*, 167 So. 664, 666 (Fla. 1936). We would not expect the Legislature to upend such a long-held legal principle without saying so expressly. Ordinarily, "statutes will not be interpreted as changing the common law unless they effect the change with clarity." *Peoples Gas Sys. v. Posen Constr., Inc.*, 322 So. 3d 604, 611 (Fla. 2021) (quoting Antonin Scalia & Bryan A. Garner, *Reading Law: The Interpretation of Legal Texts* 318 (2012)).

Finally, the broader statutory and policy context also leads us to conclude that chapter 2012-247 did not make PTC-issued certificates and permits irrevocable. The Legislature created the PTC as its agent to implement a comprehensive regulatory scheme that was expressly oriented to the public's convenience and necessity. In the regulatory context, change is the rule. We find it implausible that the Legislature would rely on implication to grant certificate-holding taxicab companies a *permanent* property right to carry on their business, with the market value of that right so dependent on the government's continued maintenance of a restrictive regulatory regime. *See Minneapolis Taxi Owners Coal., Inc. v. City of Minneapolis*, 572 F.3d 502, 509 (8th Cir. 2009) ("The general expectation of regulatory change is no less present where the value of the property interest is derived from the regulation itself.").

True, the government will sometimes convey durable property rights to induce private parties to invest and act in ways that benefit the public interest. The expected way to do that would be through a regulatory contract. *See Allied-General Nuclear Servs. v. United States*, 839 F.2d 1572, 1578 (Fed. Cir. 1988) ("After all,

when the government desires reluctant private capital to invest in risky enterprises, it is accustomed to make express contracts to 'induce' by reducing or sharing the risk."). And contracts can be a form of protected property for takings clause purposes. *Lynch v. United States*, 292 U.S. 571, 579 (1934). Yet nothing in the express terms of the 2012 law suggests the existence of a contractual relationship between the government and the holders of PTC-issued certificates and permits. Any expectation that chapter 2012-247 promised irrevocable property rights would have been unreasonable. *See Nat'l R.R. Passenger Corp. v. Atchison Topeka & Santa Fe Ry. Co.*, 470 U.S. 451, 466-67 (1985) ("[A]bsent an adequate expression of an actual intent of the State to bind itself, this Court simply will not lightly construe that which is undoubtedly a scheme of public regulation to be, in addition, a private contract to which the State is a party." (internal quotations and citation omitted)).

III

In the end, we cannot conclude that the "private property" label in chapter 2012-247 does the work that the taxicab companies want it to do. In the context of this statutory scheme,

- 16 -

and given the relevant common-law and regulatory backdrops, the Legislature's use of that term did not confer irrevocability on PTC-issued certificates and permits. Consequently, the Legislature's repeal of the 2012 law does not implicate the Florida Takings Clause.

We approve the decision under review to the extent it is consistent with this opinion.

It is so ordered.

CANADY, LABARGA, GROSSHANS, FRANCIS, and SASSO, JJ., concur.
COURIEL, J., concurs with an opinion, in which GROSSHANS and SASSO, JJ., concur.

NOT FINAL UNTIL TIME EXPIRES TO FILE REHEARING MOTION AND, IF FILED, DETERMINED.

COURIEL, J., concurring.

The parties cite this Court's decision in *St. Johns River Water Management District v. Koontz* for the proposition that the takings clause of the Fifth Amendment to the U.S. Constitution and Florida's Takings Clause are substantively "coextensive[]." 77 So. 3d 1220, 1222 (Fla. 2011), *rev'd on other grounds*, 570 U.S. 595 (2013). But in fact we said only that we had "*previously interpreted* [those provisions] coextensively." *Id.* (emphasis added) (citing

- 17 -

*Tampa-Hillsborough Cnty. Expressway Auth. v. A.G.W.S. Corp.*, 640 So. 2d 54, 58 (Fla. 1994); *Joint Ventures, Inc. v. Dep't of Transp.*, 563 So. 2d 622, 623 (Fla. 1990)).  We went on to decide that case as if the provisions were in fact coextensive, without pausing to inquire or decide whether Florida's Takings Clause had a meaning of its own.  It has words of its own, so it must.

## I

Florida's first takings clause appeared in 1838; that version bore some resemblance to the one in the Fifth Amendment. *Compare* art. I, § 14, Fla. Const. (1838) ("That private property shall not be taken or applied to public use, unless just compensation be made therefor."), *with* amend. V, cl. 4, U.S. Const. ("[N]or shall private property be taken for public use, without just compensation.").  Our 1865 Constitution, which replaced the Ordinance of Secession, used almost the same language, but added the requirement that "just compensation" be made before a taking occurred.  Art. I, § 14, Fla. Const. (1865) ("That private property shall not be taken or applied to public use, unless just compensation be first made therefor.").  The 1868 Constitution placed our takings clause at the end of a long provision securing

several other substantive rights.  This iteration tracked the Fifth Amendment, but omitted the words "for public use" and the comma that followed them.  Art. I, § 8, cl. 6, Fla. Const. (1868) ("[N]or shall private property be taken without just compensation.").

Our 1885 Constitution moved the takings clause into a shorter provision, but used the same words as its immediate predecessor. Decl. of Rights, § 12, cl. 4, Fla. Const. (1885) ("[N]or shall private property be taken without just compensation.").  Elsewhere, it added two new references to takings in the "Miscellaneous" article: Section 28 authorized the Legislature to "provide for the drainage of the land of one person over or through that of another, upon just compensation" to the latter landowner.  Art. XVI, § 28, Fla. Const. (1885).  And section 29 provided that "[n]o private property nor right of way shall be appropriated to the use of any corporation or individual until full compensation therefor shall be first made to the owner," and required that "a jury of twelve men" determine the appropriate compensation.  Art. XVI, § 29, Fla. Const. (1885).  This was the first time our Constitution used the word "full" rather than "just" to describe the compensation due.

In 1968, the voters approved a new takings clause as part of our Constitution's wholesale revision.  This version, which governs today, differs substantially from its predecessors:

> (a)   No private property shall be taken except for a public purpose and with full compensation therefor paid to each owner or secured by deposit in the registry of the court and available to the owner.

Art. X, § 6(a), Fla. Const. (1968).  This provision reintroduces the requirement that the taking occur "for a public purpose"; it adopts for all takings the requirement of "full" rather than "just" compensation; and it describes how that compensation is to be paid.  In terms of its location in the Constitution, the provision was removed from the Declaration of Rights; it now sits in article X, "Miscellaneous," in a new section titled "Eminent Domain."  It shares that section with two other provisions: one concerning land drainage that reads like article XVI, section 28 of the 1885 Constitution, *see* art. X, § 6(b), Fla. Const. (1968), and another, added by amendment in 2006, that limits the government's ability

to use eminent domain to transfer property to a "natural person or private entity," art. X, § 6(c), Fla. Const. (2006).[2]

## II

We have said that "[w]hen called upon to decide matters of fundamental rights, Florida's state courts are bound under federalist principles to give primacy to our state Constitution and to give independent legal import to every phrase and clause contained therein." *Traylor v. State*, 596 So. 2d 957, 962 (Fla. 1992); *see also* Jeffrey S. Sutton*, 51 Imperfect Solutions: States and the Making of American Constitutional Law* 179-80 (2018) (arguing that "[a] state-first approach to litigation over constitutional rights honors the original design of the state and federal constitutions"). Because a

---

2. Some have argued that article X, section 6(c) was added as a response to the U.S. Supreme Court's decision in *Kelo v. City of New London*, 545 U.S. 469 (2005), where that Court held that a city's taking of private property by eminent domain and transfer of it to a private developer was a "public use" under the federal Takings Clause. *See* Nicholas M. Gieseler & Steven Geoffrey Gieseler, *Strict Scrutiny and Eminent Domain After* Kelo, 25 J. Land Use & Envtl. L. 191, 217 (2010) (describing article X, section 6(c) as "enshrin[ing]" in the Florida Constitution "the elimination of *Kelo*-style takings"); Steven J. Eagle & Lauren A. Perotti, *Coping with* Kelo*: A Potpourri of Legislative and Judicial Responses*, 42 Real Prop. Prob. & Tr. J. 799, 832 (2008) (describing article X, section 6(c) as a "post-*Kelo*" amendment).

constitution's words are purposefully chosen and placed, we respect the will of the people when we ascribe meaning to their choice and placement.  In making sense of those words, it can help to know how they have been changed over time, and what purposeful choices those changes reflect—so we look to prior iterations of our state's Constitution as interpretive tools.  *See* Jason Mazzone & Cem Tecimer, *Interconstitutionalism*, 132 Yale L.J. 326, 348 (2022) ("[P]ast constitutions linger.  When it comes to constitution-making, there are no blank slates.").

We cast aside necessary interpretive information—worse, give short shrift to the governing text—when we declare provisions of our Constitution to be "coextensive" with federal constitutional law that is textually distinct.

GROSSHANS and SASSO, JJ., concur.

Application for Review of the Decision of the District Court of Appeal Class of Constitutional Officers/Direct Conflict of Decisions

Second District – Case No. 2D20-3326

(Hillsborough County)

Bryan S. Gowdy and Dimitrios A. Peteves of Creed & Gowdy, P.A., Jacksonville, Florida; Jason K. Whittemore of Wagner McLaughlin & Whittemore, P.A., Tampa, Florida; and J. Daniel Clark of Clark & Martino, P.A., Tampa, Florida,

for Petitioners

James Uthmeier, Attorney General, Jeffrey P. DeSousa, Acting Solicitor General, David M. Costello, Chief Deputy Solicitor General, Daniel Bell, Chief Deputy Solicitor General, Tallahassee, Florida,

for Respondent State of Florida

Christine Beck, County Attorney, and Robert E. Brazel, Chief Assistant County Attorney, Tampa, Florida,

for Respondent Hillsborough County

E.A. "Seth" Mills, Jr. and Jordan Miller of Mills Law Group, P.A., Tampa, Florida,

for Amicus Curiae Florida Taxicab Association